TEE-PAK, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Bob Pierce, Appellee).

Fourth District (Industrial Commission Division)    No. 4—85—0326WC

Opinion filed February 27, 1986.

Cohn, Lambert, Ryan, Schneider & Harman, Ltd., of Chicago (Michael R. Schneider, of counsel), for appellant.

Serkland & Muelhausen, of Chicago (James C. Serkland, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant, Robert Pierce, filed an application for adjustment of his claim under the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*) for injuries he sustained while employed by Tee-Pak, Inc. An arbitrator awarded benefits to claimant for permanent total disability and medical expenses. At the same time, the arbitrator granted a credit of $9,647.93 to Tee-Pak for payments made to claimant under a benefit program which ensures a full salary to Tee-Pak employees who are off work due to an accident or illness. On review, the Industrial Commission affirmed the decision of the arbitrator. The circuit court of Vermilion County confirmed the decision of the Commission, and Tee-Pak appeals. Claimant has filed a cross-appeal from that portion of the decision giving a $9,647.93 credit to Tee-Pak.

Claimant was employed by Tee-Pak as a shop foreman. On April 20, 1978, he bent over a machine to inspect it. As he stood up, he struck the back of his head on a turnbuckle. He felt as if something was "exploding" in him and then found himself stunned and on the floor. Claimant's head was bleeding, and he had trouble seeing. The plant safety director took him to Fern Spencer, the company nurse, who washed and dressed the head wound. Claimant returned to work for the remainder of the day.

The next day, claimant was almost completely deaf in both ears, and was nauseated and faint. He had to leave work. The following Saturday, hearing partially returned in the left ear. A few days after the accident, he began experiencing tinnitus (severe noise) and sharp pains within his head. He discharged large black blood clots from his nose. These problems were made known to Spencer, who made an appointment for claimant to see Dr. Stanley Bloustine.

On April 27, 1978, Dr. Bloustine, an otorhinolaryngologist, examined claimant at the request of Tee-Pak. His report shows that after comparing a 1974 audiogram with the 1978 audiogram, Dr. Bloustine found sensori-neural hearing loss which provided "documented evidence of further hearing loss from this recent head trauma." Claimant testified that at all times he had "severe noise" in his head and that anything loud caused a sharp pain in his head.

The pain, tinnitus and difficulties with balance continued. Tee-Pak's nurse sent claimant to Dr. Diokno, who admitted him to a hospital on May 9, 1978. Claimant was monitored for a heart condition, but the doctors ruled out myocardial infarction. On May 11 claimant returned to work, still experiencing pain, tinnitus, and imbalance.

On May 23, 1978, the nurse sent claimant to Dr. A. Reese Matteson, an otorhinolaryngologist. Dr. Matteson performed audiograms

and prescribed medication. As of August 8, 1978, he reported that claimant still had a high pitched tinnitus and that his hearing was unchanged. As of April 17, 1979, the audiogram remained the same. Claimant stated that after the accident he began having headaches more centralized around his eyes and they gradually became worse. He controlled the headaches with aspirin until the early summer of 1979.

In May 1979, claimant's previous symptoms of noise and pain in his head continued, and he began having trouble with speech and difficulty reading numbers. Tee-Pak's nurse referred claimant to Dr. Dorothy Schultz, a neurologist. Claimant testified that the nurse gave him a slip of paper upon which Dr. Schultz' address and telephone number were written. He telephoned Dr. Schultz, but was told he would need a doctor's referral. Claimant testified that Tee-Pak's nurse then suggested he ask Dr. Matteson to provide the required doctor's referral to Dr. Schultz. Dr. Matteson did so.

On June 1, 1979, Dr. Schultz examined claimant, who complained of difficulty with speech, reversing numbers, headaches and tinnitus. She found elevated blood pressure and a total loss of hearing in his right ear. Dr. Schultz referred him to Dr. Robert K. Kuramoto, an otorhinolaryngologist, for tinnitus masker evaluation. Dr. Kuramoto treated claimant from July 5 to November 26, 1979. A tinnitus masker did not alleviate the noise problem, and Dr. Kuramoto prescribed a hearing aid. In August 1979, claimant told Dr. Kuramoto he suffered from frontal headaches associated with the noise in his right ear, along with nausea and vomiting. Claimant testified that beginning in June 1979, he could not control his headaches, and the noise in his head was more than he could bear.

On September 5, 1979, Dr. Schultz again saw claimant. His headaches had increased in frequency and severity, and emesis was also being experienced. Dr. Schultz believed that claimant was suicidal and prescribed lithium for the headaches. Dr. Schultz testified that the side effects of lithium include slowness, tremor, loss of postural reflexes, stiffness, drunken-like gait, fatigue and often diabetes. On September 17, 1979, Dr. Schultz saw claimant who was beginning to experience the lithium side effects described above. After starting the lithium, however, claimant's headaches and tinnitus had ceased and his temper was no longer uncontrollable. Dr. Schultz instructed claimant to remain off work while his medications were being adjusted, and she decreased his lithium dosage.

After the decrease in lithium, claimant's headaches returned, the noise in his head became "incapacitating," and many of the side ef-

fects remained. Dr. Schultz prescribed synalgos, a pain medication, so that he would not have to take as much lithium. Once again, however, Dr. Schultz had to increase the lithium dosage. Later, she prescribed symmetrel and then sinemet to counteract the lithium side effects. After some improvement, on October 29, 1979, Dr. Schultz released claimant for work.

On November 30, 1979, Dr. Schultz prescribed parlodel to control the nausea which accompanied the use of sinemet. The parlodel treatment was without success, and medication problems resulted in his continued absence from work. In January 1980, Dr. Schultz attempted to decrease the lithium level. The headaches and tinnitus returned and she was again compelled to increase the lithium and to prescribe sinemet for the lithium side effects. The increase in lithium brought back the side effects of shuffling, staggering, wobbling and faintness. On February 11, 1980, claimant was allowed to return to work. He found himself falling against walls, staggering, and too weak to stand. Dr. Schultz prescribed various medications and told claimant he could only continue to work if he sat down most of the time. On February 29, 1980, claimant continued to have severe side effects, and on March 14, 1980, Dr. Schultz told claimant not to work. On April 1, she decreased the lithium dosage and released him for work. On April 7, 1980, Dr. Schultz noted that his condition was worse and she increased the lithium.

On approximately April 20, 1980, Tee-Pak's nurse told claimant that she did not think he was physically fit to continue working and asked him to leave the building. Claimant refused, and returned to his work. The next day, with Dr. Diokno present, the nurse again spoke to claimant. Dr. Diokno asked why claimant continued to work, but claimant refused to quit.

On April 23, 1980, Dr. Schultz saw claimant. She found that his blood sugar level was elevated, instructed him to stop working, and referred him to Dr. William P. Marshall, an internist. Dr. Marshall hospitalized claimant for treatment of his diabetes. While claimant was in the hospital, Dr. Schultz attempted to change the form and amount of lithium. The headaches and noise became "unbearable," and Dr. Schultz returned claimant to full dosage. On May 26, 1980, Dr. Schultz examined claimant and noted ataxia, poor postural reflexes and slow movement of the upper extremity. She referred him to Dr. Samuel Young, a neurologist, for a second opinion regarding claimant's ability to return to work. On June 16, 1980, Dr. Young examined claimant. Although his objective findings were not the same as those of Dr. Schultz, he agreed that claimant should not be allowed

to return to work. Dr. Schultz was under the impression that Dr. Young did not complete the examination.

On June 27, 1980, Dr. Schultz told claimant to stop working because she believed his condition was permanently disabling as a result of the work accident and the lithium therapy which was essential to relieve his pain, tinnitus and suicidal tendencies. On the same day, Dr. Schultz so informed Tee-Pak. According to Dr. Schultz, claimant's condition remained unimproved through an examination on February 13, 1981. He continued to have severe side effects, and Dr. Schultz recommended that he not walk without some help. Over Tee-Pak's objection, at the hearing before the arbitrator, a transcript of Dr. Schultz' deposition was introducted into evidence as an admission against interest because she was an agent of Tee-Pak.

On August 28, 1980, Dr. David Voris examined claimant at the request of Tee-Pak. Dr. Voris found no neurological abnormalities, and testified that claimant did not mention headaches. On the same day, Dr. Guttman examined claimant at Tee-Pak's request. Dr. Guttman found that claimant's hearing loss was 90% in the right ear and 54.6% in the left ear as compared to the 1974 findings showing a 33.4% loss in both ears. He did not address the symptoms of tinnitus or headaches.

The arbitration hearing was held on April 17, 1981. The arbitrator heard testimony and considered the medical records and reports of all nine doctors. In a decision dated January 29, 1982, the arbitrator found that claimant's disability was causally related to the accident. The disability consisted of a hearing loss, the headaches for which he took lithium, and the tinnitus. The arbitrator concluded that claimant was rendered wholly and permanently incapable of work. The award included payment for specified periods during 1978, 1979 and 1980; weekly payment for life after April 23, 1980; and medical expenses. The arbitrator also found that Tee-Pak had paid claimant $9,647.93 in full salary for time out from work following the injury, and that Tee-Pak was entitled to a credit for that amount.

Tee-Pak sought review before the Commission, and a hearing was set for October 26, 1982. The Commission granted Tee-Pak's request for a continuance, and on October 29, 1982, Tee-Pak informed claimant's counsel that on November 15, 1982, it wished claimant to be examined by Dr. Seymour Diamond, an expert on headache problems. The Commission granted claimant's motion to bar the examination by Dr. Diamond, and denied Tee-Pak's petition to reopen proofs for the examination.

On January 24, 1983, oral arguments were heard by the Commis-

sion. On February 24, 1984, the Commission entered its decision affirming the arbitrator. The Commission found a causal connection between the disability and the accident; that Dr. Schultz was an agent of Tee-Pak; that the commissioner on review had properly denied Tee-Pak's request for a medical examination; and that Tee-Pak was entitled to a credit of $9,647.93. The circuit court of Vermilion County confirmed the Commission's decision.

On appeal Tee-Pak contends that the Commission's finding of a causal connection between the accident and the present disability is against the manifest weight of the evidence. In the alternative Tee-Pak argues that the matter should be remanded to the Commission so that Tee-Pak may have another medical examination of claimant, and with directions to find that Dr. Schultz is not an agent of Tee-Pak.

With regard to its contention that there is no causal connection between claimant's injury and the accident, Tee-Pak concedes that the work injury caused claimant to suffer some hearing loss and tinnitus. It maintains, however, that the headaches and related lithium therapy are not causally connected to the accident. Tee-Pak points out that claimant continued to work steadily from the date of the accident, April 20, 1978, until September 5, 1979, when Dr. Schultz began lithium therapy. It argues that this treatment was improper for headaches and was the actual cause of claimant's present disability. Tee-Pak relies on the opinion of Dr. Voris who stated, in answer to a hypothetical question, that headaches occurring one year after an accident were not caused by the accident. Additionally, although Dr. Guttman did not discuss headaches, he stated that the hearing loss was hereditary, and not caused by the accident. In contrast, Dr. Schultz, Dr. Bloustine and Dr. Matteson found a causal connection between the injury and the disability.

■ The Commission is frequently faced with conflicting medical testimony, and it is within the province of the Commission to evaluate that testimony. We will not disturb the Commission's findings on the issue of medical causation unless contrary to the manifest weight of the evidence. (*International Harvester Co. v. Industrial Com.* (1970), 46 Ill. 2d 238, 263 N.E.2d 49.) Although an independent intervening cause can break the chain of causation between a work-related injury and subsequent disability, the chain remains intact when the subsequent disability results from treatment for the first injury. *Shell Oil Co. v. Industrial Com.* (1954), 2 Ill. 2d 590, 119 N.E.2d 224; *Lincoln Park Coal & Brick Co. v. Industrial Com.* (1925), 317 Ill. 302, 148 N.E. 79.

■ In the present case, the facts reveal a chain of causation sup-

porting the medical opinions upon which we find that the present disability was caused by the accident. On April 20, 1978, claimant struck his head at work. The next day he was almost totally deaf. A few days later, he began experiencing tinnitus and sharp pains in his head and he discharged blood clots from his nose. On April 27, Dr. Bloustine diagnosed a hearing loss caused by the "recent head trauma." From May 1978 to April 1979, Dr. Matteson unsuccessfully treated claimant for the hearing loss, which he considered to be permanent. Dr. Matteson, at the request of Tee-Pak's nurse, sent claimant to Dr. Schultz. From June 1979 through the time of the arbitration hearing, Dr. Schultz treated claimant for hearing loss and for increasingly severe tinnitus and headaches. After extensive medical treatment, lithium proved to be the only medicine which relieved claimant's pain. Unfortunately, it caused severe side effects, rendering him unable to work. Because of this chain of events we find that the Commission could reasonably infer from the record that claimant's disability, which caused him to stop working permanently in 1980, resulted from the 1978 work accident. The Commission's finding of a causal connection between the injury and claimant's present disability is not contrary to the manifest weight of the evidence.

Tee-Pak next contends that the Commission abused its discretion in denying Tee-Pak's request to have an additional medical examination of claimant on review. The statute states that additional evidence may be adduced on review where the evidence relates to the condition of the employee since the time of the arbitration hearing, or relates to matters that occurred or conditions that developed after the arbitration hearing, or was not introduced at the arbitration hearing for good cause. (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(e); Industrial Commission Rule 4—(4)(B).) Tee-Pak argues hat it had the right to know claimant's present condition, to inquire as to whether Dr. Schultz' treatment was proper, and to determine whether claimant could now perform any type of work.

■■■ Whether additional evidence should be heard on review is a question within the sound discretion of the Commission. (*Interlake Steel, Inc. v. Industrial Com.* (1985), 130 Ill. App. 3d 269, 474 N.E.2d 402; *Wirth v. Industrial Com.* (1974), 57 Ill. 2d 475, 312 N.E.2d 593.) At the time of the arbitration hearing claimant had been examined by nine doctors. All of the doctors had some connection with Tee-Pak: two doctors were Tee-Pak's expert witnesses; claimant was referred to four doctors by Tee-Pak; and the claimant was referred to the other three doctors by one of the doctors to whom Tee-Pak had referred him. A party cannot present the arbitrator with only a portion

of the case and then, faced with an adverse decision, supply additional evidence to the Commission. (*Werries v. Industrial Com.* (1985), 136 Ill. App. 3d 731, 483 N.E.2d 668.) We cannot say, under these facts, that the Commission abused its discretion in refusing to order a 10th doctor to examine claimant. If Tee-Pak had wished to use a doctor with more experience treating headaches than the other doctors, it should have done so prior to the arbitration hearing. Tee-Pak's argument that it did not know claimant suffered from headaches until the hearing had begun is belied by the record. Although the severity of the headaches had increased, they were not a new symptom. Additionally, if Tee-Pak "discovered" the headaches at the time of the arbitration hearing, it made no request for a continuance at that time. We find that Tee-Pak did not have good cause to request the additional medical examination.

Tee-Pak also insists that under the statute it has a right to determine if claimant's condition had changed since the time of the arbitration hearing. That statute includes an element of reasonable convenience to the employee. We believe that the Commission could properly find that, after three years of examinations and treatments, an examination by a 10th doctor would go beyond reasonableness. Moreover, the purpose of such an examination is to determine the nature, extent and probable duration of the injury. The Commission could reasonably find that those facts had been established sufficiently. We conclude that the Commission did not abuse its discretion in rejecting Tee-Pak's request for an additional medical examination.

Tee-Pak finally contends that the Commission erred in finding that Dr. Schultz was an agent of Tee-Pak. A treating physician chosen by the employer or its workers' compensation carrier is an agent of the employer or carrier. (*Nollau Nurseries, Inc. v. Industrial Com.* (1965), 32 Ill. 2d 190, 204 N.E.2d 745; see also *Keystone Steel & Wire Co. v. Industrial Com.* (1969), 42 Ill. 2d 273, 246 N.E.2d 228.) The record clearly shows that Tee-Pak's nurse referred claimant to Dr. Schultz. Then when claimant informed her that he had to be referred to Dr. Schultz by a physician, the nurse directed him to get the required physician referral from Dr. Matteson. Tee-Pak made no attempt to introduce testimony of the nurse, Dr. Schultz or Dr. Matteson to refute these assertions of claimant. Under these circumstances, the Commission could properly find that Dr. Schultz was an agent of Tee-Pak, and that her testimony properly was introduced as an admission against Tee-Pak's interest.

In his cross-appeal, claimant contends that the Commission erred in allowing Tee-Pak a credit of $9,647.93 because these monies were

paid as non-workers' compensation benefits. Under the Act, the employer receives no credit for benefits which would have been paid irrespective of the occurrence of a workers' compensation accident. Ill. Rev. Stat. 1983, ch. 48, par. 138.8(j).

Evidently, until April 1, 1981, Tee-Pak paid claimant full salary while he was sick, and Tee-Pak successfully obtained credit for two-thirds of those salary payments because workers' compensation benefits will pay two-thirds of claimant's salary for that same time period. The payments were made under a benefit program which ensures full salary to Tee-Pak employees who are off work due to an accident or illness, less any payments from the accident and sickness benefits of the group insurance plan. Claimant did not receive benefits under the group insurance plan, and thus nothing was deducted from the sick-pay benefits. Dale M. Cary, Tee-Pak's Manager of Accounting Services, testified that the sick pay benefits were payable whether or not claimant was injured at work.

■ Tee-Pak asserts that it should have only supplemented claimant's workers' compensation benefits with one-third salary payments. It also wishes credit for the vacation pay it paid to claimant because he received workers' compensation benefits and vacation pay is intended to be for "time off." Tee-Pak has no written policies regarding how these benefits are to be credited in workers' compensation cases. Because Tee-Pak failed to show that these benefits are limited to occupationally related disabilities, the credit section of the Act does not apply. The Commission erred in giving Tee-Pak any credit for payments made to claimant.

For the reasons stated, the judgment of the circuit court of Vermilion County confirming the decision of the Industrial Commission which granted permanent total disability to claimant is affirmed. That part of the judgment granting a credit of $9,647.93 to the employer is reversed.

Affirmed in part; reversed in part.

WEBBER, P.J., and LINDBERG, BARRY and KASSERMAN, JJ., concur.