ELGIN BOARD OF EDUCATION SCHOOL DISTRICT U-46, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Linda Weiler, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—09—3446WC

Opinion filed April 25, 2011.—Rehearing denied June 8, 2011.

Robert T. Newman, of Maciorowski, Sackmann & Ulrich, LLP, of Chicago, for appellant.

Steven J. Seidman, of Chicago, for appellee.

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Presiding Justice McCullough and Justice Hoffman concurred in the judgment and opinion.

Justice Holdridge concurred in part and dissented in part, with opinion, joined by Justice Stewart.

## OPINION

Respondent, Elgin Board of Education School District U-46, appeals an order of the Illinois Workers' Compensation Commission (Commission) awarding benefits to claimant, Linda Weiler. Respondent raises three issues on appeal. First, it argues that the Commission's finding that claimant's current condition of ill-being is causally related to an accident at work is against the manifest weight of the evidence. Second, it argues that the Commission erred in calculating claimant's average weekly wage under section 10 of the Workers' Compensation Act (Act) (820 ILCS 305/10 (West 2002)). Third, it contends that the Commission erred in denying it credit under section 8(j) of the Act (820 ILCS 305/8(j) (West 2002)) for wages paid to claimant in lieu of temporary total disability (TTD) benefits. We agree with respondent's third contention and remand the cause to the Commission for a calculation of the credit. We otherwise affirm.

## I. BACKGROUND

Claimant was employed by respondent as a teacher. In 1996, claimant suffered a stroke. To prevent similar episodes, claimant was prescribed Coumadin, a blood-thinning agent. On November 7, 2002, Dr. Richard Rosseau performed an arthroscopic procedure on claimant's right knee, which was unrelated to her work duties. To improve clotting in preparation for the surgery, Dr. Rosseau instructed claimant to stop taking the Coumadin five days prior to the procedure. Per Dr. Rosseau's instructions, a day or two following the surgery claimant resumed taking Coumadin.

Claimant returned to work full duty on November 12, 2002. At that time, claimant did not note any swelling of her right knee. On November 13, 2002, claimant struck her right knee against a metal desk as she arose from her seat to assist a student. As a result, the surgical incisions on her knee opened and began to bleed to the point that her skirt became soiled with blood. The knee also began to swell. The following day, claimant contacted Dr. Rosseau. Dr. Rosseau examined claimant on November 15, 2002, and diagnosed hemarthrosis, which he defined as "blood in a joint creating some inflammation." Thereafter, claimant treated with Dr. Rosseau for several months. During that time, Dr. Rosseau aspirated the knee, prescribed pain medication, and instructed claimant to remain off her feet. Claimant also attended physical therapy. Dr. Rosseau released claimant to return to work with no restrictions on March 31, 2003. Claimant retired in June 2003, at the end of the 2002-03 academic year.

At the arbitration hearing, claimant testified that she had been employed by respondent for 20 years. During the year preceding her injury, claimant was required to work 40 weeks (a regular school year) and the parties stipulated that she was paid an annual salary of $61,459 for this work. Claimant had two options for receiving her salary. She could be paid twice a month during each month of the calendar year (resulting in 24 payments) or she could be paid twice a month during each month of the academic year (resulting in 20 payments). Claimant chose the former option and received paychecks year round. Claimant testified that during the period of time she was off work (November 14, 2002, through March 30, 2003), she was paid her regular salary through the use of accumulated sick pay. Claimant stated that the sick pay she used has not been reinstated and that the use of the sick pay reduced her retirement benefit.

During respondent's cross-examination of claimant, it referred to a "sample letter" labeled as its exhibit No. 3. A copy of the letter has not been included in the record on appeal. However, respondent's attorney represented that the letter informed school district employees that they have the option of using earned sick leave in order to receive full pay for an absence resulting from a work-related injury, that respondent's human resources department would automatically charge sick leave when an employee is absent because of a work-related injury unless the employee directs respondent otherwise in writing, and that once accumulated sick leave is exhausted, respondent would contact the injured employee and place him or her on TTD benefits. Claimant denied ever having personally received a similar letter and stated that she never informed respondent that she preferred to receive TTD benefits instead of her full salary. The arbitrator sustained claimant's objection to the admission of respondent's exhibit No. 3 on foundational grounds.

In correspondence to claimant's attorney dated January 18, 2006, Dr. Rosseau opined that claimant's postsurgical hemarthrosis was the result of the blow to the right knee which occurred at work on November 13, 2002. Dr. Rosseau acknowledged that claimant was "significantly more prone" to hemarthrosis because she was taking Coumadin. However, he noted that the Coumadin was medically required because of claimant's vascular history, which, in addition to a stroke, was significant for mitral valve prolapse.

Dr. Rosseau provided additional evidence by deposition. Dr. Rosseau testified that the most common cause of hemarthrosis is trauma and that the condition is seen postsurgically as surgery is a form of trauma. He added, however, that hemarthrosis can occur independent of surgery as a result of an impact to a joint. With respect to the role

of Coumadin in hemarthrosis, Dr. Rosseau testified that clotting is a "very important element of wound healing" and that Coumadin would make one's blood more difficult to clot. Nevertheless, he stated that it is unusual for hemarthrosis to occur purely as a result of anticoagulation.

Dr. Rosseau indicated that claimant's hemarthrosis resulted from a form of trauma, and he identified three possible sources: (1) a tourniquet that was placed on claimant's upper thigh during the arthroscopic surgery; (2) the surgery itself; and (3) the incident at work on November 13, 2002, when claimant struck her knee on the desk. Dr. Rosseau ruled out the tourniquet as the source of claimant's hemarthrosis, noting that although some bruising is seen in the area where the device was applied, the bruising was "different and separate than the hemarthrosis." Dr. Rosseau also noted that a majority of claimant's symptoms were suggestive of hemarthrosis. For instance, he pointed out that the tourniquet effects will frequently manifest in the lower leg following the muscle plains whereas claimant's swelling was isolated to the knee. Dr. Rosseau explained that swelling limited to the knee and above would indicate that it is a more contained form of irritation or swelling which would be more related to hemarthrosis.

Dr. Rosseau acknowledged that claimant's use of Coumadin "would make her more prone to a hemarthrosis." Nevertheless, he did not believe that claimant's Coumadin levels were too high following surgery. He explained that an International Normalized Ratio (INR) of 1.0 is considered normal coagulation. The higher the INR, the slower an individual's blood coagulates. According to Dr. Rosseau, claimant's INR the day prior to surgery was "basically normal," measuring 1.1. Claimant's next INR reading was taken on November 16, 2002, and measured 2.5. Dr. Rosseau stated that although an INR level of 2.5 is elevated, it is within the "therapeutic range" of between 2 and 3. Ultimately, Dr. Rosseau described the incident at work as "the eliciting source of the hemarthrosis," explaining that claimant reported a significant increase in the pain and swelling immediately after the incident and there was no other documented source of injury or irritation.

On cross-examination, Dr. Rosseau testified that, unbeknownst to him, claimant's primary-care physician administered another anticoagulant, Lovenox, to her after she stopped taking Coumadin in preparation for the arthroscopic procedure. Dr. Rosseau testified that in many individuals, there is an "unacceptably high incidence of hemarthrosis with the use of Lovenox." Nevertheless, he noted that the Lovenox was used for only two days and was stopped on November 5, 2002, two days prior to surgery, which, according to Dr. Rosseau,

should have been adequate for the effects of the Lovenox to reverse. Dr. Rosseau also noted that by December 8, 2002, claimant's INR was measured at 6.8, which was double what is considered therapeutic.

Dr. J.S. Player reviewed claimant's medical records at the request of respondent's attorney and authored a report of his findings. Dr. Player opined that any individual who is taking Coumadin post-arthroscopy of the knee is at increased risk for a hemarthrosis when minor trauma has occurred. Dr. Player further opined that an individual whose Coumadin level is elevated beyond the therapeutic range is at risk for a hemarthrosis especially in a post-arthroscopy knee, even if a trauma has not occurred. Acknowledging that claimant sustained a direct blow to her right knee at work on November 13, 2002, Dr. Player wrote that if claimant's Coumadin level was elevated beyond the therapeutic level, then her postoperative state and elevated Coumadin level alone could be the cause of her right knee hemarthrosis regardless of the November 13, 2002, incident. Dr. Player noted, however, that although claimant resumed taking Coumadin after surgery, "it is not known whether the Coumadin was at or exceeded therapeutic level."

The arbitrator concluded that claimant sustained a compensable accident on November 13, 2002, when she struck her right knee on the desk. The arbitrator further concluded that the hemarthrosis of the right knee was causally connected to the accident of November 13, 2002. The arbitrator relied on claimant's testimony, which she described as "credible," as well as the chain of events, and Dr. Rosseau's opinion. The arbitrator rejected Dr. Player's opinion, finding that it was dependent on knowing claimant's Coumadin levels on the day of the accident, which was not shown. In calculating claimant's average weekly wage, the arbitrator determined that claimant worked 42 weeks during the school year.[1] The arbitrator therefore divided claimant's annual salary ($61,459) by 42, yielding an average weekly wage of $1,463.31. The arbitrator also found that respondent was entitled to credit for salary paid to the extent of its TTD liability pursuant to section 8(j)(2) of the Act (820 ILCS 305/8(j)(2) (West 2002)).

The Commission modified the decision of the arbitrator with respect to the calculation of claimant's average weekly wage and the section 8(j)(2) credit. Regarding the former issue, the Commission noted that although claimant had an annual contract to teach for respondent, she was only required to work 40 weeks during the school

---

[1]It is unclear how the arbitrator determined that claimant worked 42 weeks.

year. Citing *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225 (2001), the Commission concluded that the relevant inquiry in calculating one's average weekly wage is the number of days the employee worked, not the fact that he or she had an annual contract. The Commission therefore divided claimant's annual salary by 40, yielding an average weekly wage of $1,536.48, and a maximum TTD rate of $998.12. See 820 ILCS 305/8(b), 10 (West 2002). Regarding the latter issue, the Commission vacated the arbitrator's finding that respondent was entitled to a section 8(j)(2) credit (820 ILCS 305/8(j)(2) (West 2002)) for salary paid to claimant. The Commission determined that while the plain language of section 8(j)(2) suggests that respondent is entitled to such a credit, the decision in *Tee-Pak, Inc. v. Industrial Comm'n*, 141 Ill. App. 3d 520 (1986), holds otherwise. The Commission stated that under *Tee-Pak, Inc.*, an employer receives no credit for benefits which would have been paid irrespective of the occurrence of a workers' compensation accident. The Commission noted that claimant testified that she received full salary in lieu of TTD benefits but that she had to utilize earned sick pay to do so. Claimant further testified that any earned sick pay carried value as it impacted her retirement benefit. The Commission found that the arbitrator's ruling with respect to the admissibility of exhibit No. 3 was correct. As a result, claimant's testimony was unrebutted, and respondent was not entitled to a section 8(j)(2) credit for salary paid to claimant in lieu of TTD benefits. In all other respects, the Commission affirmed and adopted the decision of the arbitrator. On judicial review, the circuit court of Cook County confirmed the decision of the Commission. This appeal ensued.

## II. ANALYSIS

### A. Causation

On appeal, respondent challenges the Commission's finding that claimant's accidental injury at work on November 13, 2002, is causally connected to her diagnosis of hemarthrosis. According to respondent, claimant's hemarthrosis was not the result of the trauma of November 13, 2002. Rather, respondent asserts, the condition resulted from the arthroscopic procedure performed by Dr. Rosseau on November 7, 2002, coupled with claimant's use of Lovenox prior to the surgery and her resumption of Coumadin following the operation. In addition, respondent attributes the swelling seen after November 13, 2002, to the use of the tourniquet during the arthroscopic procedure.

To prevail on a claim for benefits under the Act, the employee must establish, among other things, that his or her current condition of ill-being is causally connected to a work-related injury. *St.*

*Elizabeth's Hospital v. Workers' Compensation Comm'n*, 371 Ill. App. 3d 882, 887 (2007). In cases involving a preexisting condition, recovery will depend on the employee's ability to show that a work-related accidental injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally connected to the work-related injury. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 204-05 (2003). The accidental injury need neither be the sole causative factor nor the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being. *Sisbro, Inc.*, 207 Ill. 2d at 205. Whether an employee's condition of ill-being is attributable to a work-related accident that aggravated or accelerated a preexisting condition or whether the condition is attributable to some other cause is a question of fact for the Commission to decide. See *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 36-37 (1982). Factual issues, including issues of witness credibility and resolving conflicts in medical testimony, are reviewed under the manifest-weight-of-the-evidence standard. *Bennett Auto Rebuilders v. Industrial Comm'n*, 306 Ill. App. 3d 650, 655 (1999). A decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent. *City of Chicago v. Illinois Workers' Compensation Comm'n*, 373 Ill. App. 3d 1080, 1093 (2007).

Here, the record reveals that claimant's prior right-knee pathology, which required surgery before the accident of November 13, 2002, evidenced a preexisting condition. Dr. Player, the physician retained by respondent, concluded in his report that claimant's postoperative state and elevated Coumadin levels alone could have caused her right-knee hemarthrosis regardless of the November 13, 2002, incident. While Dr. Rosseau, claimant's treating physician, identified several potential causes of the hemarthrosis, including the surgery itself, he testified that the accident at work on November 13, 2002, was the "eliciting cause of the hemarthrosis." Dr. Rosseau based his opinion primarily on the trauma claimant sustained at work on November 13, 2002, the significant increase in pain and swelling in the right knee thereafter, and the absence of any other documented source of injury or irritation. Further, Dr. Rosseau ruled out the other sources of trauma cited by respondent. For instance, although Dr. Rosseau acknowledged that claimant's use of Coumadin would make her more prone to hemarthrosis, he stated that claimant's clotting ability the day prior to surgery was "basically normal" and that several days after the November 13, 2002, injury, claimant's clotting ability remained within the therapeutic range. With respect to claimant's use of Lovenox, Dr. Rosseau noted that claimant ceased using the drug two days prior to surgery on her knee and he opined that this

constituted a sufficient amount of time for the Lovenox to leave claimant's system. This finding was consistent with evidence that claimant's clotting ability was essentially normal the day prior to the surgery. Dr. Rosseau also testified that the tourniquet effects will frequently manifest in the lower leg whereas claimant's swelling was isolated to the knee. In other words, the Commission was presented with conflicting medical opinions regarding the cause of claimant's hemarthrosis. The Commission adopted the causation opinion of Dr. Rosseau, explaining that Dr. Player's opinion was predicated on claimant's Coumadin level being elevated beyond the therapeutic range but the record was silent as to claimant's Coumadin level on November 13, 2002. Based on the evidence of record, we cannot say that a conclusion opposite to the one reached by the Commission is clearly apparent.

We also emphasize that claimant needed only to prove that the accident at work was *a* causative factor in her condition of ill-being. *Sisbro, Inc.*, 207 Ill. 2d at 205. Thus, even if claimant's surgery, her use of blood-thinning medications, and the tourniquet contributed to her condition, recovery may still be had if there was evidence that the accident at work on November 13, 2002, was a contributor to the hemarthrosis. Here, the evidence clearly supported a finding that the accident at work contributed to claimant's hemarthrosis. For these reasons, we affirm the Commission's decision on the issue of causation.

## B. Average Weekly Wage

Next, we address respondent's claim that the Commission erred in calculating claimant's average weekly wage. Section 10 of the Act (820 ILCS 305/10 (West 2002)) provides that the weekly benefits to which an injured employee is entitled for TTD under section 8 of the Act (820 ILCS 305/8 (West 2002)) shall be computed on the basis of the average weekly wage. Section 10 outlines four methods of calculating an employee's average weekly wage (see *Sylvester*, 197 Ill. 2d at 230-31):

"[(1)] [T]he actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52; [(2)] but if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted. [(3)] Where the employment prior to the injury extended

over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee actually earned wages shall be followed. [(4)] Where by reason of the shortness of the time during which the employee has been in the employment of his employer or of the casual nature or terms of the employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury, illness or disablement was being or would have been earned by a person in the same grade employed at the same work for each of such 52 weeks for the same number of hours per week by the same employer." 820 ILCS 305/10 (West 2002).

In this case, the Commission ostensibly used the third method outlined above to calculate claimant's average weekly wage. Respondent urges that in calculating claimant's average weekly wage, the Commission should have applied the first method set forth in section 10. Normally, the calculation of an employee's average weekly wage is a factual determination for the Commission. *Sylvester*, 197 Ill. 2d at 231-32. However, because the facts relative to claimant's average weekly wage are undisputed and this case merely involves an application of the facts to the law, our review is *de novo*. See *Anders v. Industrial Comm'n*, 332 Ill. App. 3d 501, 506 (2002).

Respondent's argument that the first method outlined in section 10 applies is foreclosed by our recent decision in *Washington District 50 Schools v. Illinois Workers' Compensation Comm'n*, 394 Ill. App. 3d 1087 (2009). Like claimant in this case, the employee in *Washington District 50 Schools*, Geri McLees, was a school teacher. McLees worked 39 weeks (a regular school year), but opted to receive her salary over the 52-week calendar year. In calculating McLees's average weekly wage, the Commission divided her annual salary by 39, the number of weeks she actually worked for the school district. The school district appealed, arguing that the Commission should have divided McLees's salary by 52, the number of weeks over which she received her salary. We rejected the school district's position. *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. Examining the plain language of section 10, we initially pointed out that the third method applies when " 'the employment prior to the injury extended over a period of less than 52 weeks.' " *Washington District 50 Schools*, 394 Ill. App. 3d at 1090 (quoting 820 ILCS 305/10 (West 2006)); see also *Sylvester*, 197 Ill. 2d at 234 (noting that the third method outlined in section 10 "deals with employment which has extended over less than 52 weeks"). Then, looking to the definition of the terms "employment"

and "employ," we found that McLees "was required to devote or apply her time and energy teaching for 39 weeks, not 52 weeks." *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. We also noted that "[t]he same observation applies when determining the period for which the District put [the claimant] to use, work, and service." *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. Since the time for which McLees was retained to work prior to her injury "extended over a period of less than 52 weeks," we found that the Commission correctly invoked the third method for calculating McLees's average weekly wage.

*Washington District 50 Schools* is directly on point. In this case, the time for which claimant was retained to work prior to her injury extended over a period of less than 52 weeks. Specifically, claimant's testimony was unrebutted that in the 52 weeks prior to the injury she was required to work only 40 weeks. Thus, the Commission did not err in dividing claimant's annual salary by 40 to arrive at her average weekly wage.

Respondent disputes the application of *Washington District 50 Schools* to this case. Respondent argues that its position is not that claimant elected to be paid year round. Instead, its position is that claimant was employed pursuant to an "annual contract," which "defined a year's work and a year's pay." Our ability to directly address respondent's position is hampered by the fact that claimant's contract has not been made part of the record. In the absence of the contract, we are left with claimant's unrebutted testimony that she was only required to work 40 weeks during the school year. Thus, pursuant to *Washington District 50 Schools*, we are compelled to uphold the method used by the Commission to calculate claimant's average weekly wage.

## C. Section 8(j) Credit

Lastly, we consider respondent's argument that it is entitled to a credit under section 8(j) of the Act (820 ILCS 305/8(j) (West 2002)) for wages paid to claimant in lieu of TTD benefits for the period of time claimant was off work due to her injury.

Section 8(j) provides in relevant part:

"1. In the event the injured employee receives benefits, including medical, surgical or hospital benefits under any group plan covering non-occupational disabilities contributed to wholly or partially by the employer, which benefits should not have been payable if any rights of recovery existed under this Act, then such amounts so paid to the employee from any such group plan as shall be consistent with, and limited to, the provisions of paragraph 2 hereof, shall be credited to or against any compensation payment

for temporary total incapacity for work or any medical, surgical or hospital benefits made or to be made under this Act. In such event, the period of time for giving notice of accidental injury and filing application for adjustment of claim does not commence to run until the termination of such payments. This paragraph does not apply to payments made under any group plan which would have been payable irrespective of an accidental injury under this Act. Any employer receiving such credit shall keep such employee safe and harmless from any and all claims or liabilities that may be made against him by reason of having received such payments only to the extent of such credit.

\*\*\*

2. Nothing contained in this Act shall be construed to give the employer or the insurance carrier the right to credit for any benefits or payments received by the employee other than compensation payments provided by this Act, and where the employee receives payments other than compensation payments, whether as full or partial salary, group insurance benefits, bonuses, annuities or any other payments, the employer or insurance carrier shall receive credit for each such payment only to the extent of the compensation that would have been payable during the period covered by such payment." 820 ILCS 305/8(j) (West 2002).

The right to credits, which operates as an exception to liability created under the Act, is narrowly construed. *World Color Press v. Industrial Comm'n*, 125 Ill. App. 3d 469, 471 (1984). Moreover, it is the burden of the employer to establish its entitlement to a credit under section 8(j) of the Act. *Hill Freight Lines, Inc. v. Industrial Comm'n*, 36 Ill. 2d 419, 424 (1967). In this case, respondent argues that pursuant to section 8(j)(2), it is entitled to a credit because claimant received full salary payments in lieu of TTD benefits.

The cardinal rule of statutory construction is to ascertain and effectuate the intent of the legislature. *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. The best indicator of the legislature's intent is the language of the statute itself, which must be given its plain and ordinary meaning. *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. We review *de novo* issues of statutory construction. *Washington District 50 Schools*, 394 Ill. App. 3d at 1090. The first clause of section 8(j)(2) states that an employer is entitled to a credit only for compensation payments made pursuant to the Act. 820 ILCS 305/8(j)(2) (West 2002); see also *World Color Press*, 125 Ill. App. 3d at 471 ("The statute clearly credits the employer with any payments made by the employer as compensation payments."). The second clause of section 8(j)(2) states that when an employer pays money other than compensation payments under the Act, the employer "*shall* receive credit for each

such payment only to the extent of the compensation that would have been payable during the period covered by such payment." (Emphasis added.) 820 ILCS 305/8(j)(2) (West 2002).

Although the second clause would appear to qualify the broad language in the first clause of section 8(j)(2), in *Tee-Pak, Inc. v. Industrial Comm'n*, 141 Ill. App. 3d 520 (1986), we seemingly rejected this interpretation of the statute. In *Tee-Pak, Inc.*, the Commission allowed the employer a section 8(j) credit under a program which ensures a full salary to employees who are off work due to an accident or illness. On appeal, we reversed, noting that under section 8(j) of the Act, "the employer receives no credit for benefits which would have been paid irrespective of the occurrence of a workers' compensation accident." *Tee-Pak, Inc.*, 141 Ill. App. 3d at 529. We determined that because the employer failed to show that the salary payments the employee received were limited to occupationally related disabilities, the employer was not entitled to a credit under section 8(j) of the Act. *Tee-Pak, Inc.*, 141 Ill. App. 3d at 529.

This case is distinguishable from *Tee-Pak, Inc.* In *Tee-Pak, Inc.*, there was evidence from which the Commission could infer that the employer intended its employees to collect *both* TTD benefits and salary payments for the same period of time. *Tee-Pak, Inc.*, 141 Ill. App. 3d at 529. In the present case there was no evidence that respondent had in place a similar policy. Thus, the limitation of section 8(j) imposed in *Tee-Pak, Inc.* does not apply here. Therefore, we hold that pursuant to section 8(j)(2) of the Act (820 ILCS 305/8(j)(2) (West 2002)), respondent is entitled to credit for salary paid to claimant, but only to the extent of its TTD liability. The cause is remanded to the Commission for a determination of the credit.

## III. CONCLUSION

For the reasons set forth above, the judgment of the circuit court of Cook County confirming the decision of the Commission with respect to the issues of causation and average weekly wage is affirmed. That part of the judgment denying respondent a credit under section 8(j)(2) is reversed. The cause is remanded to the Commission for a calculation of the credit due respondent for salary paid to the extent of its TTD liability during the relevant time period.

Affirmed in part and reversed in part; cause remanded with directions.

JUSTICE HOLDRIDGE, concurring in part and dissenting in part:
I concur in all aspects of the majority decision except the

determination to reverse the Commission's denial of a credit under section 8(j)(2) of the Act. I would affirm the denial of credit and from that portion of the majority decision, I respectfully dissent.

In *Tee-Pak, Inc. v. Industrial Comm'n*, 141 Ill. App. 3d 520, 529 (1986), this court reiterated the well-established rule that "the employer receives no credit for benefits which would have been paid irrespective of the occurrence of a workers' compensation accident." We further noted in *Tee-Pak* that an employer can receive credit for benefits paid to an employee only where the benefits "are limited to occupationally related disabilities." *Id.* In other words, the employer is entitled to a credit only where it can be shown that the payment for which credit is sought was available exclusively for occupationally related disabilities. If the payment could be had regardless of whether the employee suffered an occupational injury, then no credit is allowed. See *Village of Streamwood Police Department v. Industrial Comm'n*, 57 Ill. 2d 345, 351 (1974) (the employer is not entitled to credit for payment from the employer's pension fund where the pension benefits were not limited to occupationally related disabilities).

In the instant matter, the claimant received payment equal to her full salary from her accumulated sick leave. There is nothing in the record to establish that the claimant could only access her sick leave account for occupationally related disabilities. On the contrary, presumably the claimant's sick pay is available for both occupational and nonoccupational disabilities. See *Village of Streamwood*, 57 Ill. 2d at 351. The majority points out that employer had a policy of allowing employees to utilize sick pay in lieu of TTD benefits for occupationally related disabilities. The claimant denied knowledge of this policy. The record also established that by taking full salary payment from her accumulated sick leave, the claimant's retirement benefits through the Teachers' Retirement System would be reduced. Likewise, the record established that the claimant's access to her accumulated sick leave benefits was the same whether or not the reason for her absence was a workplace injury. Given the fact that the claimant could access her sick leave benefits without regard to the occupational nature of her disability, *Tee-Pack* clearly applies to the instant matter and prohibits the employer from taking a credit for benefits the claimant received from her accumulated sick leave.

For the foregoing reasons, I would affirm in its entirety the judgment of the circuit court, confirming the decision of the Commission.