THIRD DIVISION

May 21, 2003

No. 1-02-0375

In re
 
JOSEPH S., Alleged to be a Person Subject ) Appeal from the

to Involuntary Admission   ) Circuit Court of

 ) Cook County.

(The People of the State of Illinois, ) 

)

Petitioner-Appellee,   )

)

) Honorable

) Nathaniel R. Howse, Jr.,

Joseph S.,   ) Judge Presiding.

)

Respondent-Appellant).   )

PRESIDING JUSTICE SOUTH delivered the opinion of the court: 

After a hearing, respondent, Joseph S., was found to be a person subject to involuntary admission under the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-100 
et seq
. (West 2000)) and ordered to be hospitalized in the Department of Mental Health and Developmental Disabilities (Department).  Respondent contends that the trial court erred in finding him subject to involuntary admission when the State alleged one statutory basis for involuntary admission but argued another.  Respondent also contends that the State did not prove by clear and convincing evidence that respondent was unable to provide for his basic physical needs.  Respondent lastly contends that the court erred in admitting an "integrated social work assessment" without a proper foundation.

On December 17, 2001, a petition for involuntary admission of respondent was filed, having been signed on December 14.  The petition resulted from an emergency admission by certificate.  It alleged that respondent was mentally ill, that due to the mental illness was unable to provide for his basic physical needs so as to guard himself from serious harm, and that he was in need of immediate hospitalization to prevent harm.  Specifically, it alleged that respondent was psychotic, that he lived for a period of weeks with the decaying corpse of his mother, that he was paranoid delusional, and had illogical writings demonstrating poor contact with reality, such as "Do not negotiate with the enemy, and that is all!"

The certificate was issued by Dr. Wadley of MacNeal Hospital and stated that respondent was examined by Wadley on December 14, 2001.  It was Dr. Wadley's opinion that respondent was mentally ill and that as a result of his mental illness was both reasonably expected to inflict serious harm on himself or others and was unable to provide for his basic physical needs so as to guard himself from serious harm.  In support of this opinion, Dr. Wadley stated that respondent was "actively delusional, very paranoid.  Was found with his dead mother in apartment for several weeks."

On the basis of the petition and certificate, respondent was detained for examination at the Department's Madden Mental Health Center (Madden).  On December 17, 2001, Dr. Susan Navalro examined respondent and formed the opinion that he was mentally ill and that as a result of his mental illness was reasonably expected to inflict serious harm on himself or others.  In support of this opinion, Dr. Navalro stated that respondent was found at home in a psychotic state with the "mummified" corpse of his mother, who had been dead for several weeks judging from her condition.  His brother called the police after not hearing from his mother for a prolonged period, when it was her habit to call daily.  Respondent was very paranoid and not forthcoming at the time of Dr. Navalro's examination.  He questioned whether Dr. Navalro was tape-recording the interview and refused to speak in front of another person who entered the room.

A hearing was scheduled for December 20, 2001, and notice was served upon respondent.  After two continuances for further evaluation, the hearing was held on January 3, 2002.

Dr. Susan Nowak testified that she was a licensed psychiatrist since 1984 and was employed by the Department at Madden.  The parties stipulated that she was a psychiatrist as defined in the Code and qualified to give expert opinions.  Dr. Nowak stated that she knew respondent as a patient at Madden that she was treating.

Dr. Nowak first examined respondent on December 17, 2001, and he gave little information and seemed suspicious.  She was evaluating respondent based on discussions with respondent, written materials from his examination at MacNeal Hospital and from Madden's intake department, and observations of respondent by Madden staff members, including respondent's case manager, other social workers, and the nursing staff.  Dr. Nowak discussed with these staff members respondent's behavior, whether he was sleeping, eating, taking care of himself, what possessions he had, and the nature of his interactions with others.  Dr. Nowak had spoken with respondent on at least five or six occasions, but these meetings were brief because respondent was uncomfortable and unwilling to divulge information.  She also observed respondent daily, and he did not interact with others and was "hyper-vigilant."

Dr. Nowak stated that examining a patient's social history is one of the criteria required by psychiatric practice for making a diagnosis.  Respondent's social history was provided by his brother.  Respondent was once high functioning, with a master's degree, service in the Air Force, and 15 years' employment with a telephone company.  Then, in 1996, he was evicted because his behavior distressed the landlord, and as a result went to live with his mother.  There was at that time a dramatic change in respondent's ability to function and he became dependent upon his mother.  He was hospitalized for 76 days in 1999, and at that time was diagnosed as being psychotic and having obsessive compulsive disorder.

Dr. Nowak stated that her knowledge of the circumstances of the present hospitalization was from respondent's brother and reports from MacNeal Hospital and the police.  Respondent's brother heard from his mother regularly until suddenly, in August or thereafter, he stopped hearing from her.  When the brother called her, respondent would answer the telephone and state that their mother was sleeping or visiting.  The brother eventually called the police to check on his mother, but respondent met them at the door and told them she was sleeping.  Ultimately, respondent called a funeral home, who told him to call paramedics, and it was discovered that she was dead for six or seven weeks and that respondent had been living with her desiccated corpse.  In the house, police found bizarre writing on the walls and on papers.  Respondent was taken by the police to MacNeal Hospital, where a certificate for admission to Madden was issued.

Dr. Nowak gave her opinion that respondent suffered from a mental illness, namely paranoid schizophrenia.  Respondent was delusional and paranoid.  Some examples included that he thought Dr. Nowak was taping their initial meeting, had hearing loss in both ears because he would not allow anyone to remove his earwax, would not use an assisted hearing device because he said it was a tape recorder, accused a social worker of being a robot, and told Dr. Nowak that his brother was dead from an airplane crash since 2000.  Respondent's thinking was disordered and included bizarre logic.  He told Dr. Nowak that his admission resulted from a misunderstanding since his mother was dead only a week or so instead of several weeks.  Respondent was unable to function socially or in work situations, one of the criteria for a diagnosis of schizophrenia.  He had not been functioning on his own since his 1996 eviction, refused medical care, slept only two or three hours a night, and did not relate to anyone.

Dr. Nowak stated that respondent was unable to take care of his basic physical needs due to his delusional thinking causing him to misinterpret reality.  He refused to have earwax removed, would not use the assisted hearing device because he believed it was a recorder, his hygiene upon admission was extremely poor, and he was not keeping up basic cleanliness while in Madden.  He was taking care of hygienic tasks such as showering only when reminded by Madden staff.  Respondent had no place to live, Dr. Nowak believed that respondent would not relate with or accept help from his brother, and the brother expressed fear of respondent.  As to respondent's understanding of money and ability to handle financial affairs, Dr. Nowak stated that he is intelligent but unable to work.  Respondent became extremely upset not only when the topic of his mother's death or his illness was raised, but also when it was suggested that he throw away an empty cup.  Dr. Nowak concluded from this that he would not be able to cope with the stresses of everyday life.

The State introduced into evidence a report for disposition, comprehensive treatment plan, and a social assessment.  Dr. Nowak stated that she had produced the disposition report and that a comprehensive treatment plan is completed at the time of admission by the intake department and updated as the patient's needs are reviewed.  After reviewing the treatment plan, respondent had no objection to the psychiatric evaluation by Dr. Nowak but objected that the social assessment lacked foundation.  Dr. Nowak stated that the social assessment was prepared by respondent's case manager, who Dr. Nowak knew and whose handwriting she recognized.  Dr. Nowak knew the case manager's first name but not her last, but there were no other social workers at Madden with that first name.  Respondent's objections that the social assessment was illegible and that it was not proven who had prepared it was overruled and the social assessment was admitted.

Dr. Nowak stated that less restrictive alternatives to hospitalization were considered for respondent.  Outpatient care or an intermediary care facility would not be appropriate because respondent was very psychotic.  He would not attend outpatient care meetings, and they could not provide the level of support and supervision required.  Dr. Nowak stated that respondent was at risk of suicide, required medication, had no place to stay, and was hoarding objects.

On cross-examination, Dr. Nowak stated that respondent was in good health while in Madden except for his hearing problem.  Respondent told Dr. Nowak that his mother had been deceased for seven or eight days and that he was on a business trip during that time and was with the body for only a day or two before calling for help.  Dr. Nowak did not ask respondent about the loss of his job with the telephone company, nor did she discuss his eviction, earlier hospitalization, or whether respondent had written on the walls of his apartment.  This information was provided by respondent's brother, who Dr. Nowak had not spoken with.  Dr. Nowak stated that she did not discuss these matters with respondent because he was unwilling to discuss them.  While respondent had required medication to calm him down, he did not require it or receive it in Dr. Nowak's presence.  Dr. Nowak was not aware of any record of violence or suicide attempts by respondent.  She felt intimidated by him at least once, but he never struck anyone.  Respondent was eating while in Madden, and Dr. Nowak did not know how he obtained food before his admission. 

On redirect examination, Dr. Nowak stated that she relied on respondent's social history, after having discussed the history with the social worker who prepared it.  Dr. Nowak believed that respondent would not receive proper medical care on his own since his suspicion would cause him to misperceive the actions of others as not being in his best interest.  For the same reason, he would not be able to hold a job or utilize available social and welfare services.  As to his residence before admission, records indicated that there was writing on the wall about what respondent would tell people who inquired about his mother and that the apartment was disorderly.  From this, and his hoarding of newspapers and milk cartons while at Madden, Dr. Nowak concluded that respondent had obsessive compulsive disorder.  While respondent had not actually attacked anyone, he became extremely agitated on at least one occasion she observed, and on another when he had to be medicated.  His paranoia caused him to believe that others, who were simply speaking with him as Dr. Nowak had, wanted to attack him, and he would react in what he believed was self-defense.

Respondent testified that he gave his address as his mother's apartment, and stated that he still had a lease on the unit until September 2002.  Before his admission to Madden, he was on a business trip in Indiana with other writers for seven to nine days, starting on December 4 or 5, 2001.  His mother was alive when he left, and he spoke with her by telephone from Indiana once.  When he returned on December 12, it was night and he saw her lying in bed, so he assumed she was asleep and did not wish to disturb her.  The next morning, he saw that she was decomposing.  He called a funeral parlor, who told him to call the paramedics, and he called again the next day, December 14.

Before his admission to Madden, respondent was eating well.  He prepared the food, since his mother was old, and both helped his mother with shopping and went shopping on his own.  He stated that he was living off of his savings and his mother's savings, having "left a corporate job which I'm sick and tired of explaining about."  He did not desire to physically harm anyone while at Madden, nor did he threaten anyone, but he stated that he had to be careful when speaking because his voice "comes across like a thunder booming out of the sky" and he points with his finger, which he thought may frighten people.  As to the incident with the cup, he wanted to keep the cup because of who paid for it (the county, the state, 
etc
.), and also because he might want more coffee, so he refused to throw it away when asked, and a security guard stood up.  Respondent had not attempted to harm himself, and had no thoughts of harming himself.  When released from Madden, he would return to his mother's apartment.

Respondent asked the court for documents exonerating him and helping him enter witness protection.  He stated that his savings were adequate to support him for years, that he had no trouble sleeping at Madden or before then, "five hours per sleep cycle."  Respondent stated that he was gaining weight while at Madden and carried a towel around with him because the plastic chairs gave him calluses.  He also stated that he had "mutant emotions because of corporate life" and was working as a writer and living off his savings.  If he had physical problems after leaving Madden, he would seek alternative sources of healing such as chiropractors and herbalists.  Respondent stated that the police wanted to murder him because he could testify that they "manhandled" him at the police station.

At the conclusion of testimony and closing arguments, the court found that respondent was mentally ill, that he was a danger to himself and others, and was unable to care for his basic physical needs.  The court issued an order finding respondent to be a person subject to involuntary admission and ordering his hospitalization in a Department facility.  Respondent then filed a notice of appeal.

Respondent contends that the trial court erred in finding him subject to involuntary admission on the ground that he was a danger to himself or others where the State failed to allege this basis for involuntary admission in its petition.

A person is subject to involuntary admission under the Code if he or she has a mental illness and because of that illness is either "reasonably expected to inflict serious physical harm upon himself or herself or another in the near future" or "unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm."  405 ILCS 5/1-119 (West 2000).  This must be established by the testimony of "at least one psychiatrist, clinical social worker, or clinical psychologist" who examined the person (405 ILCS 5/3-807 (West 2000)) and proven by clear and convincing evidence (405 ILCS 5/3-808 (West 2000)).  In determining whether a person can provide for his basic physical needs, a court considers whether the person can obtain his own food, shelter, and medical care; has a place to live or a family who can assist him; can function in society; and has an understanding of money and concern for it as means of sustenance.  
In re Jakush
, 311 Ill. App. 3d 940, 944 (2000).  An order of involuntarily admission is not reversed unless it is against the manifest weight of the evidence.  
In re E.L.
, 316 Ill. App. 3d 598, 606 (2000).

Here, respondent argues that he was alleged in the complaint to be subject to involuntary admission on a "basic physical needs" basis while he was found subject to involuntary admission on the basis that he would "inflict serious physical harm." 
 It is reversible error when the pleadings allege one of the two statutory bases for involuntary admission but the arguments at trial and the findings relate solely to the other basis; they are distinct, and one cannot plead one cause of action but prove another.  
In re Moore
, 292 Ill. App. 3d 1069, 1071-72 (1997).  Based upon 
Moore
, the State concedes that the trial court erred in finding respondent subject to involuntary admission on the basis that he was a danger to himself and others.  However, the State maintains that reversal is not required where there was sufficient evidence to sustain the court's alternate finding that respondent was unable to care for his basic physical needs.  We agree with the State.  In 
Moore
, the State "did not even attempt to prove" the statutory basis originally alleged.  
Moore
, 292 Ill. App. 3d at 1071.  By contrast, the State's expert witness here, Dr. Nowak, discussed at length whether respondent was able to care for his basic physical needs.  More importantly, the State here sought and received a finding by the court that respondent was unable to care for his physical needs.  Thus, the grounds alleged in the petition were argued at the hearing and found by the trial court.

Respondent also contends that the State failed to prove by clear and convincing evidence all of the elements constituting an inability to care for one's basic needs.  Specifically, respondent argues that the State failed to present sufficient underlying or ultimate facts to support Dr. Nowak's opinions.

Expert opinions must be supported by facts, and are only as valid as the facts underlying them.  
Hiscott v. Peters
, 324 Ill. App. 3d 114, 123 (2001); 
In re Rovelstad
, 281 Ill. App. 3d 956, 969-70 (1996).  A finder of fact is not bound by an expert opinion on an ultimate issue, but may look "behind" the opinion to examine the underlying facts.  
Hiscott
, 324 Ill. App. 3d at 123;  
In re J.H.
, 153 Ill. App. 3d 616, 631 (1987). 

Here, Dr. Nowak's testimony was replete with specific factual examples of respondent's behavior to support her medical opinions.  The diagnosis of paranoid schizophrenia was supported by respondent's suspicious, nervous, and easily agitated condition and his misperceptions, including perceiving a social worker as a robot, a hearing aid as a recording device, and believing that his living brother had died in an air crash.  That same suspicious, nervous, and agitated behavior supported her opinion that respondent would not be able to interact with society or obtain money as a means of sustenance were he to be released from care.  In short, there was adequate factual evidence underlying Dr. Nowak's opinion that it was not against the manifest weight of the evidence for the court to conclude that respondent was mentally ill and, due to that illness, was unable to provide for his basic physical needs.

Even if the trial court were to consider only respondent's testimony and events witnessed by Dr. Nowak, as respondent suggests, we find no error.  Dr. Nowak observed that respondent would not interact with others due to his paranoia and was nervous when he had to interact, becoming very upset on more than one occasion.  This directly implicates respondent's ability to function in society.  Also, obtaining money as a means of sustenance inherently requires interacting with others from time to time, either at a job or when seeking assistance from welfare and social agencies.  Respondent admitted that he waited at least a day with a decomposing corpse in his apartment before he attempted to obtain help, and another day before he definitively sought help.  It was also within the trial court's power to determine witness credibility (
Eychaner v. Gross
, 202 Ill. 2d 228, 251 (2002)) to disbelieve respondent's testimony and conclude that he lived with the corpse for a longer period.  Inaction in the face of such a basic sanitation issue as having a decomposing body in one's dwelling implicates respondent's ability to obtain shelter.  The requirement that one be able to obtain shelter implies that one must be able to maintain that shelter in at least a minimally habitable condition, or the requirement would be hollow and mechanical.

Respondent lastly contends that the trial court erred in admitting an "integrated social work assessment" into evidence without proper foundation.  He argues that no evidence was presented at the hearing that this document was produced in the regular course of business or that it was a regular business practice to produce such a document.  He also argues that the document was likely generated with a view to possible litigation.

Medical records may be admitted as business records under Supreme Court Rule 236 (145 Ill. 2d R. 236), which provides:

"Any writing or record *** made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence [thereof], if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. *** The term 'business,' as used in this rule, includes business, profession, occupation, and calling of every kind."

Records made with a view towards possible litigation do not qualify as business records since they are not made in the ordinary course of business, but documents routinely prepared under a statutory duty are not rendered inadmissible because they are to be used in adversarial proceedings.  
In re A.B.
, 308 Ill. App. 3d 227, 236 (1999).  A trial court decision on the admission of a document as a business record is a matter of discretion and is disturbed only for an abuse of that discretion.  
People v. Lombardi
, 305 Ill. App. 3d 33, 42 (1999).

Mental health facilities are required within a specified time from a person's admission, voluntary or involuntary, to conduct "a comprehensive physical examination, mental examination, and social investigation of that person" with the purpose of determining "whether some program other than hospitalization will meet the needs of the person."  405 ILCS 5/3-205.5 (West 2000).  Before disposition of a case where involuntary admission is sought, a written report must be prepared for the court including "information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, [and] a preliminary treatment plan."  405 ILCS 5/3-810 (West 2000).

Respondent insists that "Dr. Nowak was never asked the proper foundation questions regarding" the document in question, and that "there was no testimony that the assessment was made in the regular course of business or that it was the regular business practice to have made such a document."  However, respondent cites no authority for the proposition that a foundation must be laid using discrete questions on the two elements of a business record or "magic words" such as "regular course of business."  Dr. Nowak testified, after the document in question was submitted to the court for admission but before an objection to its admission was denied, that a comprehensive treatment plan is completed in the intake department at the time of admission.  As to the "social assessment" in question, Dr. Nowak stated that it is part of the integrated assessment performed on respondent by his case manager and social worker.  She also stated that this document was written by respondent's case manager, who Dr. Nowak knew and worked with.  Dr. Nowak identified the case manager's handwriting and stated that she knew the case manager's first name but not her last name, noting that there were no other social workers at Madden with that name.  We see no abuse of discretion in concluding on this evidence that there was a procedure at Madden of routinely generating these social assessments as part of a general assessment upon a patient's admission and that the document in question was such an assessment of respondent performed by a particular Madden case manager.

Respondent also claims that the social assessment was likely generated with a view to possible litigation and therefore was not admissible as a business record.  This particular issue was not raised in the trial court, but we will address it since it is subsumed in plaintiff's objection to the document's foundation.  As stated above, the Code requires a "social investigation" of all persons admitted to mental health facilities, voluntarily or not, and of all persons alleged to be subject to involuntary admission, in order to assist in determining the proper treatment or disposition.  405 ILCS 5/3-205.5, 3-810 (West 2000).  The placement of the "social assessment" in question in a larger "integrated assessment" causes us to conclude that it is a record of one or both of the social investigations required by the Code.  Dr. Nowak used the social assessment to help explain her opinion regarding the appropriate disposition of respondent, the purpose stated in the Code for such social investigations.  The social assessment was thus required by statute to support decision making by the Department and trial courts and routinely performed at Madden and other mental health facilities in the course of their medical, and thus business, practice.  Therefore, it was admissible as a business record.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

WOLFSON and HALL, JJ., concur.