# Illinois Official Reports

## Appellate Court

*Sunny Hill of Will County v. Illinois Workers' Compensation Comm'n*,
**2014 IL App (3d) 130028WC**

| | |
|---|---|
| Appellate Court Caption | SUNNY HILL OF WILL COUNTY, d/b/a Sunny Hill Nursing Home, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Dalia Mahoney-Tapella, Appellee). |
| District & No. | Third District<br>Docket No. 3-13-0028WC |
| Filed | June 26, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Workers' Compensation Commission properly awarded claimant temporary total disability benefits for a shoulder injury she suffered while working as a licensed practical nurse after obtaining a release to return to work following her recovery from an earlier shoulder injury, since the Commission's finding that claimant's present condition of ill-being was causally related to the second injury was not against the manifest weight of the evidence and there was no evidence of any intervening accidents. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 12-MR-328; the Hon. Barbara Petrungaro, Judge, presiding. |
| Judgment | Affirmed and remanded. |

| Counsel on Appeal | Timothy G. Shelton, Peter H. Carlson, Robert J. Finley, and Starr M. Rayford, all of Hinshaw & Culbertson LLP, of Chicago, for appellant. |
| | |
| | Daniel F. Capron, of Capron & Avgerinos, P.C., of Chicago, for appellee. |
| | |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justices Hoffman, Hudson, and Stewart concurred in the judgment and opinion. |

## OPINION

¶ 1    On July 31, 2009, claimant, Dalia Mahoney-Tapella, filed an application for adjustment of claim pursuant to the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2008)), seeking benefits from the employer, Sunny Hill of Will County, d/b/a Sunny Hill Nursing Home (Sunny Hill). She alleged a work-related injury that occurred while she was assisting a patient on December 5, 2008, causing injury to her right shoulder and lower back. Following a hearing, the arbitrator determined claimant's condition of ill-being was causally related to the accident that arose out of and in the course of her employment, and claimant's presence at a flower shop she co-owned did not constitute a "return to work" or absolve Sunny Hill of its liability to pay temporary total disability (TTD) benefits. The arbitrator awarded claimant TTD benefits of $596.00 per week for the periods of December 6, 2008, through June 9, 2009; July 23, 2009, through August 27, 2009; and September 22, 2009, through June 15, 2011.

¶ 2    On review, the Illinois Workers' Compensation Commission (Commission) affirmed and adopted the arbitrator's decision. On judicial review, the circuit court of Will County confirmed the Commission's decision.

¶ 3    Sunny Hill appeals, arguing (1) the Commission erred in awarding claimant TTD benefits and (2) the Commission's finding that claimant's present condition of ill-being is causally related to the December 5, 2008, work accident is against the manifest weight of the evidence. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5    The following factual recitation is taken from the evidence presented at the arbitration hearing on June 15, 2011.

¶ 6    Claimant testified she first began working for Sunny Hill in November 2004 as a licensed practical nurse. Her duties included taking care of 25 to 50 patients, including lifting them as necessary. In 1996, prior to working at Sunny Hill, claimant suffered an injury to her neck and underwent a cervical fusion procedure. In September 2007, while working at Sunny Hill,

claimant suffered an injury to her right shoulder. On February 15, 2008, Dr. Paul Trksak performed an arthroscopic debridement of claimant's right rotator cuff and subacromial decompression. On October 31, 2008, Dr. Trksak noted claimant had reached maximum medical improvement (MMI). Dr. Trksak released her to return to full-duty work at Sunny Hill effective November 2, 2008.

¶ 7    On December 5, 2008, claimant was working at Sunny Hill, assisting two certified nurse assistants who were manually lowering an obese patient from a hoyer lift that was stuck "a good 10 feet up in the air." As they brought the patient down, claimant felt "something just like snap and pain down my shoulder and arm." She also felt pain in her neck and lower back. Claimant immediately sought treatment from Advanced Physicians, complaining of "pain in [her] right shoulder, neck, mid back and low back." An MR arthrogram of claimant's right shoulder was performed on December 22, 2008. It revealed a full thickness perforation of the rotator cuff. On January 6, 2009, an MRI of claimant's lower back was performed. It revealed severe facet arthritis with lateral stenosis in the lower lumbar area. Advanced Physicians referred claimant to Dr. Gregory Markarian, an orthopedic surgeon.

¶ 8    Claimant first saw Dr. Markarian on January 15, 2009, at which time he diagnosed a recurrent tear of the right rotator cuff (he was unsure whether the MR arthrogram demonstrated a partial tear or a full thickness tear), AC joint arthritis and bicipital tendonitis. Based on her presentation and the fact she was asymptomatic prior to the accident at issue, Dr. Markarian opined claimant's injuries were causally connected to the December 5, 2008, work accident.

¶ 9    On January 28, 2009, Dr. Markarian performed an arthroscopic debridement of the partially torn rotator cuff and subpectoral biceps tenodesis. On February 5, 2009, claimant underwent an EMG of her lower back which revealed an acute S1 radiculopathy. She underwent an EMG of her neck on March 12, 2009, which revealed an acute C7 radiculopathy. On March 24, 2009, claimant received a lumbar epidural steroid injection by Advanced Physicians. On April 14, 2009, claimant received a cortisone injection in her right shoulder by Dr. Markarian. On April 16, 2009, Dr. Markarian released claimant to return to light-duty work.

¶ 10    On June 9, 2009, Dr. Kevin F. Walsh, performed an independent medical evaluation of claimant. Dr. Walsh's report is not included in the record and was not admitted into evidence at arbitration. The only reference to Dr. Walsh's findings are in Dr. Markarian's evidence deposition and Dr. Anthony Romeo's (who began treating claimant in 2010) initial report recounting claimant's medical history. According to Dr. Markarian's evidence deposition and Dr. Romeo's initial report, Dr. Walsh concluded claimant's injuries were not related to the December 5, 2008, work accident and returned her to full-duty work on June 10, 2009.

¶ 11    On July 23, 2009, claimant reported to Dr. Markarian she aggravated her right shoulder (she felt swelling and pain) apparently as a result of returning to full-duty work too soon. Dr. Markarian restricted claimant from work again and ordered an MRI of her right shoulder, which was performed on August 18, 2009. The MRI revealed tendinosis, moderate bursitis and minimal subacromial encroachment due to degenerative and inflammatory changes. Dr. Markarian testified these injuries were part of the "injury spectrum" and were related to the December 5, 2008, work accident. Claimant was released to return to light-duty work effective August 28, 2009.

¶ 12    On September 22, 2009, Dr. Markarian gave claimant a cortisone injection in her right shoulder and took her off work. He ordered an MR arthrogram which was performed on

October 8, 2009. It revealed partial tearing of the rotator cuff. Dr. Markarian explained the partial tear of the rotator cuff would not have been evident in the August 2009 MRI results. According to Dr. Markarian, an MRI would reveal "obvious defects where [the tissue is] pulled away off the bone and it's retracted" but tears that are not retracted "can be difficult to interpret." The MR arthrogram reveals more because a dye is injected into the joint. Dr. Markarian recommended claimant undergo another shoulder surgery to revise the previous repair. Claimant last saw Dr. Markarian on October 15, 2009.

¶ 13    On September 22, 2010, by agreement of the parties, Dr. Romeo, an orthopedic surgeon, evaluated claimant. Dr. Romeo diagnosed persistent tendonitis status post previous biceps tenodesis. He opined this condition was related to the December 5, 2008, work accident. Dr. Romeo noted claimant could either live with her symptoms or undergo additional surgery.

¶ 14    On September 28, 2010, Sunny Hill terminated claimant's employment because she had been off work for more than one year.

¶ 15    On February 24, 2011, Dr. Romeo performed a right shoulder arthroscopy with a revision subacromial decompression and a revision open biceps tenodesis. As of the date of arbitration, claimant remained in postoperative therapy and continued to treat with Dr. Romeo. She had not yet been released to return to work.

¶ 16    In 2007, claimant opened a flower shop with her two daughters following the death of her husband and the suicide of her son. She owns a 53% stake in the business, although her daughters run it full-time. Following the December 5, 2008, work accident, claimant has gone to the flower shop at least three days per week, but does not follow a regular schedule, she is not formally employed by the flower shop, she does not draw a paycheck, and she does not keep track of her hours. The flower shop first made a profit in 2010 ($2,000), which claimant distributed to her daughters who actually work there. When asked what she does at the flower shop, claimant responded she answers the phone if it rings (including taking orders over the phone), picks up fax sheets, or occasionally her daughters will ask her to "grab *** another rose or a daisy or a gerber *** for them" while they are preparing arrangements. Claimant also stated she watches over her grandchildren in a babysitting role at the flower shop. She testified she does not do anything more physically taxing at the flower shop than she would do at her home during this time.

¶ 17    Sunny Hill introduced evidence of surveillance over six days (April 10-11, 2009, August 10-11, 2010, April 2, 2011, and April 5, 2011), approximately 53 hours in total, of claimant, including video of claimant at the flower shop while she was off work. Surveillance video, totaling approximately 35 minutes in length, was presented by the employer at the arbitration hearing. The video depicts claimant walking from her car to the back entrance of the flower shop, sometimes carrying bags and/or a laptop case or briefcase, sitting on the back stoop of the business, standing and walking around outside of the flower shop, picking wildflowers with her granddaughter, holding a baby inside the flower shop, and driving to a park.

¶ 18    The arbitrator found claimant sustained work-related injuries to her right shoulder, neck, and lower back, on December 5, 2008. He awarded claimant TTD benefits of $596.00 per week for the periods of December 6, 2008, through June 9, 2009; July 23, 2009, through August 27, 2009; and September 22, 2009, through June 15, 2011. In reaching his decision, the arbitrator noted as follows:

> "It is apparent that the [claimant's] partial ownership interest in a local flower shop that is operated on a day-to-day basis by her daughters does not constitute a 'return to

work' in the sense of disqualifying her from receipt of TTD benefits. The [claimant] is a licensed practical nurse by profession. This is her full[-]time occupation. Her trips to the flower shop to visit with, and occasionally assist, her daughters are sporadic and infrequent. As such, they do not serve to absolve [Sunny Hill] from liability for the payment of TTD benefits."

¶ 19   The Commission affirmed and adopted the arbitrator's decision. It also remanded the matter pursuant to *Thomas v. Industrial Comm'n*, 78 Ill. 2d 327, 399 N.E.2d 1322 (1980). On December 14, 2012, the circuit court of Will County confirmed the Commission's decision.

¶ 20                                        II. ANALYSIS

¶ 21   On appeal, Sunny Hill argues the Commission erred in finding that: (1) claimant was entitled to TTD benefits due to its failure to apply what it refers to as the "stable labor market test"; and (2) claimant's current condition is causally related to the December 5, 2008, work injury.

¶ 22   "The time during which a worker is temporarily totally disabled is a question of fact." *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090, 666 N.E.2d 827, 828 (1996). The Commission's decision to award TTD will not be disturbed unless it is against the manifest weight of the evidence. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-19, 561 N.E.2d 623, 627-28 (1990). A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 120, 675 N.E.2d 175, 178 (1996).

¶ 23   "It is a well-settled principle that when a claimant seeks TTD benefits, the dispositive inquiry is whether the claimant's condition has stabilized, *i.e.*, whether the claimant has reached maximum medical improvement." *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 142, 923 N.E.2d 266, 271 (2010). "Once an injured employee's physical condition stabilizes, he is no longer eligible for TTD benefits ***." *Archer Daniels*, 138 Ill. 2d at 118, 561 N.E.2d at 627. This court has held, "[t]he duration of TTD is controlled by the claimant's ability to work and his continuation in the healing process." *City of Granite City v. Industrial Comm'n*, 279 Ill. App. 3d 1087, 1090, 666 N.E.2d 827, 829 (1996).

¶ 24   Sunny Hill argues the Commission's failure to apply what it terms the "stable labor market test" (ostensibly derived from language in *E.R. Moore Co. v. Industrial Comm'n*, 71 Ill. 2d 353, 361-62, 376 N.E.2d 206, 209 (1978)) in determining whether claimant was entitled to TTD benefits was error and requires reversal. The issue in *E.R. Moore* was whether the claimant should have been awarded *total permanent disability benefits* because there was no "reasonably stable market" in which claimant could be employed. *Id.* at 359-60, 376 N.E.2d at 208-09. The claimant in *E.R. Moore* was 58 years old and her work injury (contact dermatitis) prevented her from returning to domestic service work–the only type of work she had ever performed. *Id.* at 364, 376 N.E.2d at 211. Based on the claimant's work-related injury, age, work experience, training and capabilities, the court found it was reasonable for the Commission to determine "there existed no reasonably stable market in which claimant could be employed," and therefore its award for total permanent disability was proper. *Id.* at 362-64, 376 N.E.2d at 210-11. Sunny Hill cites a string of cases that reference the "stable labor market" language in *E.R. Moore*, but which apply it to TTD benefits instead of permanent disability benefits. See, *e.g.*, *J.M. Jones Co. v. Industrial Comm'n*, 71 Ill. 2d 368, 375 N.E.2d 1306

(1978) (working approximately 1½ hours per day as a hot dog vendor did not preclude a TTD award); *Zenith Co. v. Industrial Comm'n*, 91 Ill. 2d 278, 437 N.E.2d 628 (1982) (driving a bus for a few hours per day did not preclude a TTD award); *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 761-62, 800 N.E.2d 819, 828 (2003) (driving a shuttle bus 10 to 15 hours per week did not preclude a TTD award); *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 675 N.E.2d 175 (1996) (consistent work selling real estate precluded claimant from a TTD award).

¶ 25    Sunny Hill's argument notwithstanding, we doubt the existence of a separate "stable labor market test" to determine TTD benefits. While it is true cases such as *J.M. Jones*, *Zenith*, *Mechanical Devices*, and *Dolce* refer to the "stable labor market" language in *E.R. Moore*, the essence of the TTD determination is as set forth by our supreme court in *Interstate Scaffolding*–whether the claimant's condition has stabilized. The existence or nonexistence of a "stable labor market" for a particular job simply is not germane to the determination of whether an individual's condition has stabilized. However, the fact a claimant has returned to work in some capacity *may* be relevant to whether and to what extent the claimant's condition has stabilized. To this extent, it may well be appropriate to consider the type of work being performed, hours worked, and any income earned, all in order to ascertain whether the claimant's condition has stabilized. See *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 178, 741 N.E.2d 1144, 1150 (2000) ("The factors to be considered in determining whether a claimant has reached maximum medical improvement include a release to return to work, with restrictions or otherwise, and medical testimony or evidence concerning claimant's injury, the extent thereof, the prognosis, and whether the injury has stabilized."). The courts in *J.M. Jones*, *Zenith*, *Mechanical Devices*, and *Dolce* considered the claimants' earnings and "work" as one factor–not necessarily the dispositive factor–in determining whether they were entitled to TTD benefits.

¶ 26    Thus, in determining TTD benefits in this case, the Commission's focus was properly directed to whether claimant's condition had stabilized and she had reached MMI, and not whether she was working in a "stable labor market." Claimant's presence at the flower shop, and whether it constituted a "return to work," was but one factor for the Commission to consider in its analysis. Sunny Hill argues the Commission erred in awarding TTD. We disagree.

¶ 27    Claimant's "work" at the flower shop did not establish her condition had stabilized. Claimant opened the flower shop with her daughters as a way of grieving the loss of her husband and son. Although she is the majority owner, her daughters run the business. Claimant is present at the flower shop approximately three days per week. Her presence at the flower shop was the same both before and after the December 5, 2008, work injury. While at the flower shop, she primarily watches her grandchildren in a babysitting role. On occasion, claimant answers the phone, retrieves faxes, and assists customers if her daughters are occupied. At times, she may provide minor assistance to her daughters when they are making flower arrangements and may make an occasional delivery if it is a "light one." Claimant does no more at the flower shop than she would do at home. She does not draw a paycheck, have a regular schedule, or track her hours. She has received no income from the flower shop business. The surveillance records and video submitted by Sunny Hill do not contradict claimant's testimony about her activities at the flower shop.

¶ 28    We take this opportunity to address this court's statement in *Granite City*, that "[t]o show entitlement to TTD benefits, claimant must prove not only that he did not work, but that he was unable to work." *Granite City*, 279 Ill. App. 3d at 1090, 666 N.E.2d at 829. Here, claimant's activities at the flower shop could arguably be characterized as "work." A literal application of the preceding language in *Granite City* might therefore dictate a denial of TTD benefits, a result we do not believe was intended by *Granite City*. We believe the quoted language in *Granite City* should not be interpreted to mean a return to *any* work will result in the denial of TTD benefits, but rather evidence of such work may be probative of whether the employee's condition has stabilized which, according to the supreme court in *Interstate Scaffolding*, is the proper focus of the TTD analysis. In the present case, we do not believe claimant's activities at the flower shop demonstrated her condition had stabilized.

¶ 29    Similarly, the medical evidence in this case does not demonstrate claimant's condition had stabilized. Claimant underwent surgery on her right shoulder on January 28, 2009. She remained off work until April 16, 2009, when she was released to light-duty work by Dr. Markarian. Effective June 10, 2009, Dr. Walsh returned claimant to full-duty work apparently after having determined claimant's injuries were not related to the December 5, 2008, work accident. On July 23, 2009, claimant reported to Dr. Markarian she had aggravated her right shoulder. Dr. Markarian restricted her from work again effective July 23, 2009. Following an August 2009 MRI and a cortisone injection, Dr. Markarian returned her to light-duty work effective August 28, 2009. On September 22, 2009, claimant still had pain in her right shoulder and Dr. Markarian restricted her from work again. Following an October 2009 MR arthrogram, Dr. Markarian diagnosed a partial tearing of the rotator cuff and recommended surgery. On February 24, 2011, Dr. Romeo performed surgery on claimant's right shoulder. As of the June 15, 2011, arbitration hearing, claimant was still in post-operative therapy and continued to treat with Dr. Romeo. He had not released her to return to work. This evidence does not necessarily indicate claimant's condition had stabilized.

¶ 30    The arbitrator found TTD benefits were appropriate because (1) claimant's presence at the flower shop and occasional assistance to her daughters there did not constitute a "return to work" and (2) she had not yet reached MMI nor had she been released to return to work. The Commission adopted the arbitrator's decision. Based on this evidence, we find the Commission's award of TTD benefits is not against the manifest weight of the evidence. (We note the record contains evidence claimant was working light-duty at Sunny Hill from approximately April 16, 2009, to June 9, 2009. The claimant was awarded TTD benefits during this time. However, Sunny Hill does not assert this as error and any such claim is therefore forfeited.)

¶ 31    Next, Sunny Hill asserts the Commission's decision that claimant's current condition (full thickness rotator cuff tear) is causally related to the December 5, 2008, accident is against the manifest weight of the evidence. Specifically, Sunny Hill contends claimant failed to establish (1) the December 5, 2008, work accident caused a change in her preexisting rotator-cuff condition or (2) that an intervening, aggravating event occurring after her June 2009 surgery caused her current injury.

¶ 32    "To prevail on a claim for benefits under the Act, the employee must establish, among other things, that his or her current condition of ill-being is causally connected to a work-related injury." *Elgin Board of Education School District U-46 v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 943, 948, 949 N.E.2d 198, 203-04 (2011). Where the

claimant suffers from a preexisting condition, she must "show that a work-related accidental injury aggravated or accelerated the preexisting disease such that the employee's current condition of ill-being can be said to be causally connected to the work-related injury." *Id.* at 949, 949 N.E.2d at 204. "The accidental injury need neither be the sole causative factor nor the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being." (Emphasis in original.) *Id.* Whether a work-related injury aggravated a preexisting condition such that the injury is compensable under the Act is a question of fact which we review under the manifest weight of the evidence standard. *Id.*

¶ 33    Here, the record contains sufficient support for the Commission's causation finding. Although claimant suffered a previous shoulder injury and underwent an arthroscopic debridement of the right rotator cuff and subacromial decompression in February 2008, she reached MMI and was released to return to full-duty work on October 31, 2008. Claimant performed her job duties without difficulty or the need for further medical treatment until the second injury on December 5, 2008, when she felt "something just like snap and pain down [her] shoulder and arm," as well as pain in her neck and lower back. She immediately sought treatment and shortly thereafter underwent an arthroscopic debridement of what turned out to be a partially torn rotator cuff and subpectoral biceps tenodesis. Claimant received postoperative physical therapy for the shoulder injury. In March 2009, she received a lumbar epidural steroid injection as treatment for her back injury. In April 2009, claimant was still experiencing pain in her right shoulder and was given a cortisone injection and released to light-duty work by her treating physician. Following a June 2009 independent examination by Dr. Walsh, he returned claimant to full-duty work after apparently concluding she was at MMI and her injuries were not related to the December 5, 2008, work accident.

¶ 34    In July 2009, Dr. Markarian again restricted claimant from work after she reported pain and swelling in her right shoulder. An August 2009 MRI on her right shoulder revealed tendinosis, moderate bursitis and minimal subacromial enchroachment due to degenerative and inflammatory changes. She was returned to light-duty work. In September 2009, claimant still had right shoulder pain, and in October 2009 she underwent an MR arthrogram which revealed a partially torn rotator cuff. Dr. Markarian explained the tear would not have been visible on the August 2009 MRI. He recommended surgery.

¶ 35    In September 2010, Dr. Romeo evaluated claimant and diagnosed persistent tendonitis status post previous biceps tenodesis related to the December 5, 2008, work accident. Dr. Romeo performed a right shoulder arthroscopy with a revision subacromial decompression and a revision open biceps tenodesis.

¶ 36    The Commission noted, "[a]ll of the petitioner's physicians–Advanced Physicians, Dr. Markarian and Dr. Romeo–have identified the accident of December 5, 2008[,] as the causal factor for the petitioner's ongoing right shoulder problems." In opposition, Sunny Hill suggests Dr. Walsh's opinions were somehow more persuasive. First, Sunny Hill did not even introduce Dr. Walsh's report into evidence, let alone provide his testimony. Other than a brief mention in the initial report of Dr. Romeo and in Dr. Markarian's deposition, Dr. Walsh's causation opinion appears nowhere else. Moreover, the record is barren of any basis or foundation supporting Dr. Walsh's opinion. See *Gross v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶ 24, 960 N.E.2d 587 (" 'Expert opinions must be supported by facts and are only as valid as the facts underlying them.' " Further, "[t]he proponent of expert testimony must lay a foundation sufficient to establish the reliability of the

- 8 -

bases for the expert's opinion." (quoting *In re Joseph S.*, 339 Ill. App. 3d 599, 607, 791 N.E.2d 80, 87 (2003))). Second, it is the province of the Commission to determine the credibility of witnesses and the weight to be accorded their testimony. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221, 223-24 (1980). The record does not support Sunny Hill's contention that Dr. Walsh's opinion deserved to be given more weight than it was apparently accorded by the Commission.

¶ 37　Sunny Hill also argues claimant's current injury (full rotator cuff tear) could have been the result of an intervening, aggravating event. Specifically, Sunny Hill notes that claimant reported she aggravated her shoulder in late July 2009. However, according to Dr. Markarian, claimant aggravated her shoulder because she was forced back to full-duty work while still undergoing physical therapy and without Dr. Markarian's consent. Dr. Markarian testified the exact "mechanism" by which she aggravated her shoulder was not important because she should not have been working. Therefore, we agree with the Commission that "[t]here is no evidence of any intervening accidents."

¶ 38　For the reasons stated, the Commission's finding that claimant's present condition of ill-being is causally related to the December 5, 2008, work accident is not against the manifest weight of the evidence.

¶ 39　　　　　　　　　　　　　　III. CONCLUSION

¶ 40　For the reasons stated, we affirm the circuit court's judgment, confirming the Commission's decision, and remand the cause for further proceedings pursuant to *Thomas*, 78 Ill. 2d 327, 399 N.E.2d 1322.

¶ 41　Affirmed and remanded.