# Illinois Official Reports

## Appellate Court

*Simpson v. Illinois Workers' Compensation Comm'n*, 2017 IL App (3d) 160024WC

| | |
|---|---|
| Appellate Court Caption | CURTIS SIMPSON, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION (City of Peoria, Appellee). |
| District & No. | Third District<br>Docket No. 3-16-0024WC |
| Filed | April 18, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 15-MR-78; the Hon. James Mack, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Robert W. Bach, of Peoria, for appellant.<br><br>Boyd O. Roberts III and Kyle M. Tompkins, of Hasselberg, Grebe, Snodgrass, Urban & Wentworth, of Peoria, for appellee.<br><br>Thomas W. Duda, of Law Offices of Thomas W. Duda, of Palatine, for *amicus curiae* Associated Fire Fighters of Illinois.<br><br>Jessica E. DeWalt, of Illinois Municipal League, of Springfield, *amicus curiae*. |

JUSTICE MOORE delivered the judgment of the court, with opinion. Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion.
Presiding Justice Holdridge dissented, with opinion.


**OPINION**

¶ 1    The claimant, Curtis Simpson, appeals the judgment of the circuit court of Peoria County, which confirmed the decision of the Workers' Compensation Commission (Commission) to deny him benefits under section 8 of the Workers' Compensation Act (Act) (820 ILCS 305/8 (West 2014)), which he sought against his employer, the City of Peoria (City). In addition, the following motions have been taken with the case on appeal: (1) the City's motion to strike the *amicus curiae* brief filed by the Associated Firefighters of Illinois (AFFI) on behalf of the claimant and (2) the motion of the Illinois Municipal League (IML) for leave to intervene as *amicus curiae* and to file a brief on behalf of the City. For the following reasons, we grant the City's motion to strike as to those portions of the AFFI's brief that contain or reference matters that are *de hors* the record, grant IML's motion to intervene as *amicus*, deeming its brief to be filed *instanter*, and affirm the judgment of the circuit court, which confirmed the decision of the Commission.

¶ 2                                   FACTS
¶ 3    The claimant was employed by the City as a firefighter. On May 21, 2008, the claimant filed an application for adjustment of claim under the Act (820 ILCS 305/1 *et seq.* (West 2008)), alleging work-related permanent injury to his heart by virtue of a heart attack. An arbitration hearing was held on March 19, 2014, in which the claimant amended his application to designate the injury as "heart attack and cardiovascular disease." The following evidence was adduced at the arbitration hearing.

¶ 4    The claimant testified that he began employment with the City as a beginning firefighter/hoseman in 1976. He served as a front line or line of duty firefighter for approximately 22 years, and testified in detail regarding his extensive history of exposure with regard to fire, smoke, and other toxins; his demolition of buildings; high-stress situations; and noise. He also testified that when he became a fireman, protective equipment was not available, but it progressively became more available as time went on.

¶ 5    The claimant testified that he became an administrative officer for the City's fire department in 1997 and worked in this capacity until the end of his career. In his first administrative positions, such as Assistant Chief, he was not as closely related to the fire and basic life support calls in terms of his day-to-day activities in that he was only required to respond to multi-alarm fires. However, he testified that there was a lot of stress involved when he became Battalion Chief and became responsible for the safety of 60 firefighters throughout an entire 24-hour period. In that position, he had to respond to all working fires.

¶ 6    The claimant testified that on January 12, 2008, at the age of 63, he was home sweeping and cleaning his garage. After he finished, he went into the house to take a shower and get ready for dinner. After his shower, he felt some moderate pain and lay down on the bed to

rest. His girlfriend at the time, who is now his wife, came and asked him what was wrong. Although the pain was not debilitating, she insisted he go to the hospital. He was treated at the emergency room of Proctor Hospital by a cardiologist, Darrel Gumm, who diagnosed cardio enzyme elevation and then heart attack. Following that, he underwent an angiogram and the placement of two stents. He was placed on several medications: Atenolol, Lisinopril, sodium vasolate, and Plavix, which is a blood thinner. He soon learned that taking a blood thinner such as Plavix disqualified him from working in any capacity at the City fire department.

¶ 7        The claimant testified that he did not have a family history of cardiovascular disease, had never been a smoker, and his alcohol use was minimal. As a result of his heart attack, he applied for a duty disability pension, which was granted. Since that time, he has had cardiovascular treatment in the form of cardiac rehabilitation services and had a third stent placement by Dr. Gumm in 2009. Due to his cardiovascular condition, he no longer engages in stressful activities or a regimented exercise program for fear of having another heart attack.

¶ 8        On cross-examination, the claimant testified that in addition to the traumatic experiences he went through as a firefighter, there were many positive outcomes and good things that happened while he was working, such as saving lives. During the course of his career as a firefighter, he never sought mental health treatment or psychological counseling. The stress of the job never got to the point that he needed medical intervention or felt it was affecting his ability to do his job or perform the everyday activities of his life.

¶ 9        Once he moved into an administrative capacity in 1997 for the City, the requirement that he physically enter a burning building was significantly diminished. In addition, his hours changed from 24 hours on, 48 hours off, to a standard 8 a.m. to 5 p.m., 40 hours-per-week schedule. However, every other month he would be on call as the Division Chief to respond to all working fires.

¶ 10        At the time of his heart attack, the claimant was on medication for hypertension (high blood pressure) and hyperlipidemia (high cholesterol). He had been tested for sleep apnea but the test was negative, although certain medical records report a history of sleep apnea. His mother also had a history of hypertension, although the medical records indicate that the claimant, at some point in time, reported a history of heart disease in his mother. The claimant characterized himself as overweight at the time of the heart attack, having been in more of a sedentary job. While cleaning his garage on the day of his heart attack, he moved half a bag of bird seed out of the way and rolled a cart with more bird seed as well. He now is retired, lives in Arizona, and has regular stress tests under the care of a cardiologist but is not under any physical restrictions from any doctor.

¶ 11        The evidence deposition of Dr. Virginia Weaver was admitted into evidence on behalf of the claimant. Dr. Weaver testified regarding a vast array of credentials, the most relevant being that she is a doctor of public health at the Bloomberg School of Public Health at Johns Hopkins University. She is board certified in internal medicine and occupational medicine. She is a member of the American College of Occupational and Environmental Medicine and serves on the medical advisory board of the International Association of Firefighters (IAFF).

¶ 12        Dr. Weaver testified that she prepared a report concerning the claimant at the claimant's attorney's request. In preparation for her report, dated September 9, 2013, Dr. Weaver reviewed the claimant's medical records from his emergency room admission and subsequent

cardiac treatment; the report and deposition of the City's expert, Dr. Fintel; and the report of Dr. McDowell, a resident of the IAFF, who assisted Dr. Weaver in the evaluation of the claimant's condition and its cause. Dr. Weaver testified that she also conducted a phone interview with the claimant.

¶ 13　　Dr. Weaver testified that she spoke with the claimant in order to get an understanding of his working career and specific issues within his job that could have resulted in exposure to any of the number of firefighting hazards that can result in cardiovascular disease. She testified that the claimant's work history is consistent with most firefighters in the United States in that, during the first two to three years of his employment as a firefighter, he generally did not use any type of breathing apparatus during fire suppression and overhaul activities. Following that, he began using self-controlled breathing apparatus (SCBA) equipment during active fire suppression but not during the overhaul phase. In the last couple of decades, the data shows that overhaul activities are as high-risk as fire suppression activities, and it is recommended now that firefighters keep their SCBA equipment on the entire time they are doing suppression and overhaul.

¶ 14　　Dr. Weaver testified that as a result of the multiple times the claimant undertook fire suppression activities without SCBA equipment, the claimant had extensive exposure to chemical asphyxiates, such as carbon monoxide and cyanide. In addition, Dr. Weaver testified that the claimant's stress and noise exposure during his 22 years of active firefighting was extensive and that this type of occupational stress is a risk factor for heart disease. Dr. Weaver testified that the claimant's history of hypertension "can certainly be occupational as a firefighter and non-occupational." She recognized that the claimant's obesity, age, sex, and history of hyperlipidemia were also risk factors but that chronic occupational exposure from firefighting in terms of chemicals, stress, noise, and disrupted sleep were risk factors as well.

¶ 15　　Dr. Weaver explained recent developments regarding occupational hazards related to firefighting and cardiovascular disease. It has been very clear for a long period of time that acute exposure to certain chemical asphyxiates during fire suppression activities followed by a cardiac event within 24 to 48 hours signifies a work-related injury. However, there is now literature that shows that chronic carbon monoxide exposure increases the risk of hypertension and elevated blood levels of inflammatory markers which are risk factors for subsequent cardiac disease. Other potential mechanisms for cardiovascular disease from chronic smoke exposure include increased formation of free radicals, subsequent endothelial dysfunction, increased coagulability of the blood, and increased progression of atherosclerosis. In addition, shift work involving sleep deprivation has now been correlated with hypertension, diabetes, obesity, and heart disease. Chronic noise and stress are also associated with an increased risk for chronic hypertension. Dr. Weaver concluded that the claimant had 31 years of exposure to these chronic risk factors and that it is therefore her opinion, within a reasonable degree of medical certainty, that his occupation may have been a cause of his cardiovascular disease and myocardial infarction.

¶ 16　　On cross-examination, Dr. Weaver testified that she is not board certified in cardiovascular disease, critical care medicine, or nuclear cardiology. The IAFF has had a long-standing contractual relationship with the Bloomberg School of Public Health, where she is Director of the Occupational and Environmental Medicine Residency. Funds are transferred to the school to provide salary support for faculty to oversee residents rotating at

IAFF to assist with questions of causation with regard to injuries in firefighters. The main focus of her practice in this position is to provide causation expertise for firefighters with about 5 to 10 percent of her practice devoted to treating patients. She does not treat patients with cardiovascular disease.

¶ 17      With regard to specific exposures, Dr. Weaver testified that benzene, carbon monoxide, hydrogen cyanide, asbestos, P.A.H.'s, formaldehyde, carbon disulfide, diesel exhaust, and soot are routinely reported at fires where monitoring has been done. However, specific information about which of these chemicals a firefighter has been exposed to over the course of his or her career and in what amounts is almost never available, making exposure assessment extremely difficult for research purposes. This is true in the case of the claimant as well.

¶ 18      The claimant also introduced records from his line of duty disability pension examination into evidence. According to an independent medical disability report prepared by Dr. Robert Ayers at the Occupational Health Foundation on April 30, 2008, the claimant had been evaluated 30 years prior to the exam with coronary angiography for chest pain. He was diagnosed as having coronary spasm and his angiogram was normal at that time. It was his impression that it was marital stress related. He was not given any medications and had no recurrence. The report noted that the claimant had been treated for high blood pressure and elevated cholesterol for several years also.

¶ 19      Regarding the incident at issue in this case, the report indicated that the claimant presented to the Proctor Emergency Room for chest pain on January 12, 2008. His blood enzymes changed, and he was diagnosed as having a heart attack. He was seen by Dr. Gumm, who performed a coronary angiography and he had two stents placed and "has done okay since then." He had no recurrent chest pain as of that date. Regarding occupational history, it was noted that at the time of the injury, the claimant was the Assistant Fire Chief for the City. He had been employed there for 31 years. He performed administrative work with occasional physical work. He was a front line firefighter for 22 years. He was advised by the Chief that because he is taking Plavix, he is not able to do firefighting work. With regard to whether the claimant's disability was caused by an on-the-job incident, the report noted that the claimant was cleaning his garage at the time preceding the incident. However, the report noted that, based upon legislation passed in Illinois, taking effect January 1, 2008, firefighters are included in the designation that would allow them to claim work relatedness to any heart problems. The report concluded that the statute would allow this to be rebutted in a legal setting.

¶ 20      Finally, the claimant introduced a pension board examination report prepared by Dr. M. Fayez Malik of Heartcare Midwest on May 1, 2008. Dr. Malik's impressions of the claimant included: coronary artery disease post-stenting with no evidence of angina or failure at that time but with moderate disease in the other vessels which was being actively followed by Dr. Gumm at that time with risk factor modifications; hypertension with blood pressure slightly elevated at the time of the report; and hyperlipidemia with an improving lipid profile. Dr. Malik recommended that the claimant follow up with Dr. Gumm with a pre-office visit stress test to reassess the stented vessels and other territories, continue to take medications as instructed, limit salt intake, and check blood pressure at home.

¶ 21      Exhibits were admitted into evidence on behalf of the City. First, the job descriptions regarding the administrative positions the claimant held during the final nine years of his

career were admitted into evidence. The claimant's most recent position of Assistant Fire Chief is summarized as an assistant to the fire chief in the administration and direction of the fire department—overseeing, coordinating, and reviewing the activities and staff of three divisions within the department. A review of the list of essential job functions for this position reveals a host of administrative responsibilities. However, essential job functions include serving as incident commander at large emergency scenes. In addition, working conditions are listed as occasional exposure near fumes or airborne particles and extremely hazardous, life threatening environments at emergency scenes.

¶ 22 With regard to the claimant's prior administrative position of Fire Division Executive, essential job functions were heavy in administrative work. However, job functions also included responding to and managing emergency scenes through the implementation of an incident command system as assigned. With regard to working conditions, the job description states that while performing the essential functions of this position, the employee is frequently exposed to wet and humid conditions, fumes or airborne particles, extreme cold, and extreme heat. In addition, the employee is occasionally exposed to toxic or caustic chemicals, work in high precarious places, and work with explosives, with irregular hours and shift times. The working conditions for this position are typically moderately quiet unless on an emergency scene, then the conditions are typically loud.

¶ 23 With regard to Battalion Chief, the claimant was charged with assuring the protection of lives and property through supervision of all employees during normal operations. Job functions included a host of administrative duties, but also included command and control of multi-unit response to fire, rescue, and emergency scenes; investigation and reporting of all vehicular accidents involving fire apparatus or personnel while on duty; and direction and possible assistance with the extrication of persons from car accidents and other entrapments. The position description specifies that while performing the essential functions of this position, the employee is frequently exposed to flames, smoke, extreme hot or cold conditions, work in high precarious places, hazardous materials, risk of electrical shock, and violent and uncontrollable individuals. The description also states that working time may require irregular hours and shift times and frequently loud working conditions.

¶ 24 The claimant's work history records with the City reflect that he was hired as a firefighter on August 30, 1976. The record includes some gaps in time as far as the claimant's service but shows that he worked four years as a hoseman, took a six-month leave of absence for military training, and worked until at least 1993 as a front line firefighter, with some time periods serving as fire engineer as well. The first record of his service in an administrative capacity shows a date of 2004, and it appears he served as Fire Division Executive for two years, followed by Assistant Fire Chief for three years. There is not a record of the claimant serving as Battalion Chief included in the exhibit, although the claimant clearly testified to serving in that position.

¶ 25 The City introduced an independent medical evaluation (IME) report on the claimant, conducted by Dr. William S. Scott at St. Francis Medical Center on July 15, 2008, at the request of the Firemen's Pension Fund of Peoria. Of relevance to this appeal, Dr. Scott opined that based on his personal risk factors, non-work location, and activities at the time of the cardiac event, the claimant's condition was not caused by an on-the-job incident. Dr. Scott stated that the claimant has coronary artery disease associated with personal risk factors and a coronary event at home while doing strenuous activities. Dr. Scott determined that the

claimant seems to have the same general risk factors as the regular population of people with coronary artery disease and that it is known that "other men with similar personal risk factors in different occupations or even in no occupations can experience similar events." Dr. Scott concluded that "it would appear to be not medically valid to assume his cardiac event occurred solely due to his occupation as a firefighter while ignoring valid risk factors of age, sex, hyperlipidemia, [and] long history of hypertension."

¶ 26    The report and evidence deposition of Dr. Dan Fintel of the Cardiology Division of The Feinberg School of Medicine at Northwestern University was admitted into evidence on behalf of the City. Dr. Fintel conducted a record review regarding the claimant. Dr. Fintel's report states as follows:

> "I do not believe the patient-reported history of coronary vasospasm in the 1980s contributes to [the claimant's] risk for the cardiac event on 1/12/08. Relevant medical records to substantiate this report are not available for review. The Proctor Hospital angiogram dated 1/14/08 definitively identifies multi-vessel atherosclerotic coronary artery disease, with an obstructive lesion in the right coronary artery. Coronary angiography is the gold standard study to establish the diagnosis of coronary artery disease. Extensive coronary disease, like that identified in [the claimant], is due to the interplay of non-modifiable genetic predisposition and lifestyle factors such as diet, exercise, and habits. While the acute rupture of a coronary cholesterol plaque can be related to hormone surges during severe physical and emotional stressors, this is *not* the type of process indicated in the angiogram or the clinical history at [the claimant's] presentation. The [claimant's] risk factors for the development of coronary disease included age, male sex, hypertension, hyperlipidemia, and obesity.
>
> [The claimant's] cardiac symptoms occurred while the patient was at home, off duty, and performing physical labor on his own accord. These symptoms are best described by Dr. Dhanekula, whose history dated 1/13/08 indicates that the chest discomfort came on in the shower *after* [the claimant] was working in his garage with heavy items. As such, I do *not* believe the cardiac event was caused or precipitated by his work as a firefighter. The evidence in the medical record, namely [the claimant's] documented risk factors, presenting clinical history, and angiographic findings, strongly suggest that the event of 1/12/08 was due to the progression of coronary atherosclerosis (narrowing of the arteries), which in turn was the result of underlying risk factors." (Emphases in original.)

¶ 27    During his deposition, Dr. Fintel testified extensively regarding his credentials in the area of cardiovascular disease and treatment, including board certifications in cardiovascular diseases, critical care medicine, and nuclear cardiology. About 80% of his time on the staff at Northwestern entails attending to patients in the coronary care unit, the observation unit where he admits patients with suspected cardiac conditions, and the consultation service where he performs cardiac consultations. He also attends a busy outpatient cardiac practice in the clinic building. Academically, he oversees residents, lectures at Northwestern and all over the world, and publishes between one and three articles or book chapters per year in various texts. In the medical/legal consultation arena, Dr. Fintel testified that he does about two-thirds of his work on behalf of defendants and one-third on behalf of plaintiffs.

¶ 28    Dr. Fintel testified consistently with his record review report. In addition, in the deposition, Dr. Fintel was asked whether he had an opinion based upon a reasonable degree

of medical and surgical certainty as to whether the claimant's cardiac event could have been caused by his employment as a firefighter. In response, Dr. Fintel stated:

> "My opinion is that in the presence of these significant risk factors for coronary artery disease, the hypertension, hyperlipidemia, mild family history, male sex, that [the claimant] was the essential kind of powder keg waiting to explode, that is, that he had risk factors for coronary disease that were the cause of his atherosclerosis, and that the events that occurred while working in his garage on January 12, 2008[,] were a culmination of that process, and the mild heart attack that resulted was a direct correlate or consequence of his risk factors leading to his underlying coronary disease."

¶ 29     On cross-examination, Dr. Fintel testified that atherosclerotic process is not fully understood, but the risk factors he outlined earlier increase the probability that it will develop. He agreed that given the evidence of coronary heart disease found in the claimant at the time of his heart attack, it would be fair to say that coronary artery disease had been present for a substantial period of time prior to 2008. He testified that he reviewed no records and had no knowledge of the particular duties the claimant performed as a firefighter.

¶ 30     On May 2, 2014, the arbitrator issued a decision awarding the claimant PPD benefits pursuant to section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 2008)), representing 25% loss of use of the whole person. The City sought review before the Commission, which issued its decision on January 20, 2015. Finding that the application of section 6(f) of the Act (820 ILCS 305/6(f) (West 2008)) presents a case of first impression, the Commission turned to the Illinois Supreme Court's decision in *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 460-63 (1983), for guidance as to the analysis to be employed to determine whether a legislative presumption has been rebutted. Employing "Thayer's bursting-bubble hypothesis," which posits that once sufficient evidence is produced " 'to support a finding of the nonexistence of the presumed fact,' " the presumption ceases to operate and the issue is determined as if no presumption ever existed, the Commission first considered the amount of evidence needed to rebut the presumption created by section 6(f) of the Act. *Id.* at 462-63 (citing McCormick's Handbook of the Law of Evidence § 345, at 821 (Edward W. Cleary ed., 2d ed. 1972), and quoting Michael H. Graham, *Presumptions in Civil Cases in Illinois: Do They Exist?*, 1977 S. Ill. U. L.J. 1, 24). Noting that the presumption applicable in this case is a legislative one, the Commission determined that it requires "stronger evidence" to overcome.

¶ 31     Turning to the case at bar, the Commission found that the City had successfully rebutted the presumption that the claimant's cardiovascular disease was causally related to his employment as a firefighter "by providing strong evidence through its experts' opinions along with [the claimant's] own health history, work history and [the claimant's] own testimony to show there were other causes of [the claimant's] cardiovascular problems and his condition is not related to his employment as a firefighter." Finding the presumption to be successfully rebutted, the Commission weighed the evidence to determine whether the claimant met his burden to prove by a preponderance of the evidence that his "heart attack" was related to his employment with the City. The Commission found that the claimant failed to meet his burden because at the time of his heart attack, he was at home, had just physically exerted himself, and was not performing any activity connected to his duties as a firefighter or Assistant Fire Chief. In addition, the Commission found that during the last one-third of

his career, the claimant was working in an administrative capacity, performing tasks of a more sedentary nature, and had several cardiac risk factors, including being a male of advanced age, overweight, and on medications for high blood pressure and high cholesterol. The Commission also noted that the claimant had a poor diet and family history of hypertension. Due to the extent of his atherosclerotic disease, the Commission found credible Dr. Fintel's opinion that the claimant was essentially "a powder keg waiting to explode" and found Dr. Fintel's opinion, as well as those of Drs. Scott and Ayers, to be more credible than that of Dr. Weaver. As such, the Commission found that the claimant failed to meet his burden of proof and that his claim is not compensable.

¶ 32    The claimant sought review of the Commission's decision before the circuit court of Peoria County. On December 17, 2015, the circuit court entered an order confirming the decision of the Commission. On January 7, 2016, the claimant filed a notice of appeal with this court. On May 23, 2016, AFFI filed a motion for leave to file a brief as *amicus curiae* on behalf of the claimant. The City filed no response to the motion, and on June 8, 2016, this court entered an order allowing the *amicus curiae* brief. On June 17, 2016, the City filed a motion to strike the *amicus curiae* brief and AFFI requested leave to respond to the motion to strike. On July 27, 2016, this court entered an order allowing AFFI to respond to the motion to strike and taking the motion with the case.

¶ 33    On October 17, 2016, after this case had been fully briefed and placed on the call of the docket for December 8, 2016, IML filed a motion to intervene as *amicus curiae* and to file a brief in support of the City. IML acknowledged that the date for filing an *amicus* brief was long past due but argued that the parties to this matter will not be unfairly prejudiced by the granting of the motion and that it was not informed by the City that the AFFI submitted an *amicus* brief until September 1, 2016. IML claimed in its motion that its interest in this case is substantial because the claimant's claim "threatens hundreds of the League's municipal members and their citizenry," and this court's decision "will substantially increase the burden on municipalities if they will be required to pay workers' compensation claims for injuries to the administrative staff of fire departments that do not arise out of and in the course of normal employment." On October 21, 2016, this court entered an order taking IML's motion with the case and requiring IML to file its proposed *amicus curiae* brief within seven days. On October 31, 2016, this court received IML's proposed *amicus* brief.

¶ 34                                        ANALYSIS

¶ 35    We begin by considering the City's motion to strike the *amicus curiae* brief filed by AFFI. Illinois Supreme Court Rule 345(a) (eff. Sept. 20, 2010) provides as follows:

> "A brief *amicus curiae* may be filed only by leave of the court or of a judge thereof, or at the request of the court. A motion for leave must be accompanied by the proposed brief and shall state the interest of the applicant and explain how an *amicus* brief will assist the court."

¶ 36    On May 23, 2016, AFFI filed a motion pursuant to Rule 345(a), along with a copy of the proposed brief and affidavit of AFFI President Pat Devaney, in which he averred that the AFFI assisted in drafting, presenting, and arguing House Bill 928, which culminated in the enactment of section 6(f) of the Act. 820 ILCS 305/6(f) (West 2008). According to paragraph one of the City's motion to strike, it appears that the City received a copy of the motion and proposed brief as per the certificate of service attached to AFFI's motion. The City did not

file an objection to AFFI's motion, despite having notice of the brief's contents prior to this court's order of June 8, 2016, granting the motion. Instead, the City filed a motion to strike the brief on June 17, 2016, which this court ordered to be taken with the case. Having considered the City's motion, AFFI's response thereto, and the City's reply, we grant the motion to strike as to any material contained or referenced in AFFI's brief that are *de hors* the record. See *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 60 (1987) (striking briefs of *amicus curiae* that relied upon materials that were not part of the record on appeal).

¶ 37        We next consider the motion of the IML to intervene as *amicus curiae* and to file a brief on behalf of the City. Illinois Supreme Court Rule 345(b) (eff. Sept. 20, 2010), which governs the timing for filing of a brief of an *amicus curiae*, provides that "[u]nless the court or a judge thereof specifies otherwise, it shall be filed on or before the due date of the initial brief of the party whose position it supports." Having received IML's proposed *amicus* brief, and in the interest of giving full consideration to all interested parties in this case of first impression, this court grants IML's motion to file its *amicus* brief out of time.

¶ 38        Turning to the merits of the claimant's appeal, we begin our analysis by making a determination of the applicable standard of review. The standard of review, which determines the level of deference to be afforded the Commission's decision, depends on whether the issue presented on appeal is one of fact or one of law. See *Johnson v. Illinois Workers' Compensation Comm'n*, 2011 IL App (2d) 100418WC, ¶ 17. Our review of the Commission's factual findings is limited to determining whether such findings are against the manifest weight of the evidence. *Id.* A finding of fact is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 233 Ill. 2d 364, 370 (2009). "Commission rulings on questions of law are reviewed *de novo*." *Johnson*, 2011 IL App (2d) 100418WC, ¶ 17. "We also apply a *de novo* standard of review when the facts essential to our analysis are undisputed and susceptible to but a single inference, and our review only involves an application of the law to those undisputed facts." *Id.*

¶ 39        Here, in accordance with the above-stated principles, the propriety of the Commission's decision presents us with two separate inquiries involving two separate standards of review. The first issue on appeal involves the interpretation of section 6(f) of the Act (820 ILCS 305/6(f) (West 2008)) and a determination as to whether the Commission properly applied the rebuttable presumption set forth therein. This is an issue of law for which our standard of review is *de novo*. See *Johnson*, 2011 IL App (2d) 100418WC, ¶ 17. The second issue requires us to determine the propriety of the Commission's ultimate determination that the claimant's condition of ill-being was not causally related to his employment as a firefighter. This issue mandates that we confirm the Commission's decision unless it is against the manifest weight of the evidence. See *id.*

¶ 40        Having determined the appropriate standards of review to be employed in this case, we turn to section 6(f) of the Act, which provides, in relevant part, as follows:

>        "Any condition or impairment of health of an employee employed as a firefighter *** which results directly or indirectly from any *** heart or vascular disease or condition, [or] hypertension *** resulting in any disability (temporary, permanent, total, or partial) to the employee shall be rebuttably presumed to arise out of an in the course of the employee's firefighting, *** and, further, shall be rebuttably presumed

to be causally connected to the hazards or exposures of the employment. *** However, this presumption shall not apply to any employee who has been employed as a firefighter *** for less than 5 years at the time he or she files an Application for Adjustment of Claim concerning this condition or impairment with the Illinois Workers' Compensation Commission."[1]   820 ILCS 305/6(f) (West 2008).

¶ 41    Turning to the first issue on appeal, which requires us to make a legal determination regarding the application of section 6(f), we begin by addressing the issue raised by IML in its *amicus* brief, that the claimant is not a firefighter for purposes of section 6(f) because he served in an administrative capacity as Assistant Fire Chief at the time of his heart attack and was not actively engaged in firefighting. This issue was not raised by the parties below. At no time has the City disputed that the claimant is a firefighter.

¶ 42    The Commission found that the petitioner was a firefighter at the time of his heart attack, a finding that we cannot say is against the manifest weight of the evidence because an opposite conclusion is not clearly apparent. See *Beelman Trucking*, 233 Ill. 2d at 370. The claimant served as a front line firefighter for 22 years, followed by service in managerial capacities for the 11 years prior to his heart attack, during the latter of which he did, at times, respond to the scenes of fires to coordinate firefighting efforts. For these reasons, we find that the claimant's occupation does fall within the auspices of section 6(f).

¶ 43    While we recognize the IML's concerns that applying the presumption to the claimant in this case "will substantially increase the burden on municipalities if they will be required to pay workers' compensation claims for injuries to the administrative staff of fire departments," this court is simply enforcing the statute as written based on the record before us, and it is outside of our province to rewrite the presumption as it pertains to firefighters who have worked their way through the ranks of a fire department to managerial positions.

¶ 44    The evidence is also undisputed that the claimant suffered a heart attack and has an underlying atherosclerotic disease, which contributed to this injury, both of which are directly related to a heart or vascular disease or condition. Accordingly, pursuant to section 6(f), the claimant's condition is rebuttably presumed to arise out of and in the course of the claimant's firefighting and to be causally connected to the hazards or exposures of firefighting. 820 ILCS 305/6(f) (West 2008). As such, the issue becomes whether the Commission properly applied the presumption. Concurrent with our taking the present case under advisement, this court was asked to determine the application of this presumption in *Johnston v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160010WC. In the *Johnston* opinion, we set forth in detail how the presumption is to be applied, and our analysis and holding in *Johnston* is directly applicable to the case at bar.

¶ 45    This Court in *Johnston* adopted Thayer's bursting bubble hypothesis, which was referenced in the decision of the Commission in the case at bar. *Id.* ¶¶ 36-37 (citing *Diederich v. Walters*, 65 Ill. 2d 95, 100-01 (1976)). This theory regarding the effect of a rebuttable presumption posits that " 'once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the

---

[1]We note that this language was added to section 6 of the Act (820 ILCS 305/6(f) (West 2008)) by Public Act 95-316 (eff. Jan. 1, 2008). Accordingly, the language set forth later in this section, which states that "[t]he changes made to this subsection by Public Act 98-291 shall be narrowly construed," does not apply to the statutory language at issue in this appeal. 820 ILCS 305/6(f) (West 2014).

evidence adduced at trial as if no presumption had ever existed.' " *Id.* ¶ 36 (quoting *Diederich*, 65 Ill. 2d at 100-01, citing 1 Spencer A. Gard, Jones on Evidence § 3:8 (6th ed. 1972)). In determining the amount of evidence required to terminate the operation of the presumption, this court set forth a detailed analysis of the differing standards that are applied depending on the origin of the presumption. See *id.* ¶¶ 39-40. In a case such as this, where there is a statutory presumption, and the statute is silent as to the amount of evidence required, we found that principles of statutory interpretation and, specifically, a review of its legislative history, was required to determine the legislature's intent. *Id.* ¶ 43.

¶ 46 After a detailed analysis of the legislative history of section 6(f) of the Act, this Court determined that "the legislature intended an ordinary rebuttable presumption to apply, simply requiring the employer to offer some evidence that something other than [the] claimant's occupation as a firefighter caused his condition." (Emphasis omitted.) *Id.* ¶ 45. As such, in order to rebut the 6(f) presumption, it is not necessary that the employer eliminate any occupational exposure as a possible contributing cause of the claimant's condition. *Id.* ¶ 51. Rather, once the employer introduces some evidence of another potential cause of the claimant's condition, the presumption ceases to exist and the Commission is free to determine the factual question of whether the occupational exposure was a cause of the claimant's condition based on the evidence before it but without the benefit of the presumption to the claimant. *Id.*

¶ 47 Here, as mentioned above, the Commission was aware of and specifically cited Thayer's bursting bubble hypothesis in its decision. In determining the amount of evidence required to terminate the effect of the presumption, the Commission determined that "strong" evidence was required, a higher standard than "some evidence," which this court found is required in *Johnston*. (Emphasis omitted.) *Id.* ¶ 45. The Commission found that the employer introduced some evidence to rebut the presumption through the testimony of Dr. Fintel. Dr. Fintel testified that the claimant had three major risk factors for heart disease: high cholesterol, hypertension, and obesity. He then testified that these "risk factors" caused the heart disease that resulted in a heart attack. We agree with the Commission that this constitutes sufficient evidence of another cause of the claimant's heart disease and that the presumption thereby ceased to operate per our analysis in *Johnston*.[2] *Id.* ¶ 51. As such, the Commission was free to determine the factual question of whether the occupational exposure was a cause of the claimant's condition based on the evidence before it but without the benefit to the claimant of the presumption. *Id.* Accordingly, we find that the Commission properly applied the presumption set forth in section 6(f) of the Act. 820 ILCS 305/6(f) (West 2008).

¶ 48 Having found that the Commission properly applied the presumption set forth in section 6(f) of the Act, we will proceed to determine whether the Commission's determination that the claimant's work as a firefighter did not cause his heart attack and underlying heart disease was against the manifest weight of the evidence. See *Johnson*, 2011 IL App (2d)

[2]We note that hypertension, which is one of the major risk factors Dr. Fintel testified caused the claimant's heart disease and resulting heart attack, is itself rebuttably presumed to be causally connected to the duties of a firefighter. 820 ILCS 305/6(f) (West 2008). However, evidence of the risk factors of high cholesterol and obesity remain as potential other causes, serving to "burst" the Thayer bubble and terminate the operation of the presumption. See *Johnston*, 2017 IL App (2d) 160010WC, ¶ 51.

100418WC, ¶ 17. As previously stated, the Commission's determination on a factual matter such as this is only against the manifest weight of the evidence if an opposite conclusion is clearly apparent. See *Beelman Trucking*, 233 Ill. 2d at 370.

¶ 49    Applying the appropriate standard of review to the Commission's determination that the claimant's employment as a firefighter for the City was not a cause of the claimant's heart attack and underlying heart disease, we cannot say that an opposite conclusion is clearly apparent. The Commission was very specific in its decision as to its reasoning and its findings regarding the evidence. It found Dr. Fintel's opinion to be more credible than that of Dr. Weaver because it found Dr. Fintel, as a cardiologist, is better credentialed and possessed a greater foundational understanding of the claimant's condition. Dr. Fintel testified that the claimant's risk factors—including his gender, obesity, age, poor diet, and high cholesterol—were the causes of the claimant's condition. In reviewing the decision of the Commission, we give deference to its determinations resolving conflicts in the evidence or regarding credibility of witnesses and the weight that their testimony is to be given. *Shafer v. Workers' Compensation Comm'n*, 2011 IL App (4th) 100505WC, ¶ 35 (citing *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 206 (2003), and *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980)). For these reasons, we decline to disturb the Commission's determination.

¶ 50                                    CONCLUSION

¶ 51    For the foregoing reasons, we grant the City's motion to strike AFFI's *amicus* brief as to any matters contained or referenced in AFFI's brief that are *de hors* the record. We grant IML's motion to file an *amicus* brief out of time. Further, we affirm the judgment of the circuit court, which confirmed the Commission's decision.

¶ 52    Affirmed.

¶ 53    PRESIDING JUSTICE HOLDRIDGE, dissenting.

¶ 54    I join the majority's judgment as to the *amicus* briefs and associated motions. However, I dissent from the remainder of the majority's judgment for the reasons stated in my dissent in *Johnston v. Illinois Workers' Compensation Comm'n*, 2017 IL App (2d) 160010WC, ¶¶ 65-72 (Holdridge, P.J., dissenting). Relying on *Johnston*, the majority holds that the City rebutted the presumption of causation prescribed in section 6(f) of the Act (820 ILCS 305/6(f) (West 2014)) by presenting Dr. Fintel's testimony that (1) the claimant had three major risk factors for heart disease (high cholesterol, hypertension, and obesity) and (2) these risk factors caused the claimant's heart disease, which resulted in his heart attack. *Supra* ¶ 47. I disagree.

¶ 55    As I noted in my dissent in *Johnston*, in order to establish causation under the Act, a claimant need only prove that some act or phase of his employment was *a* causative factor in his ensuing injuries. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003); *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592 (2005). Thus, the section 6(f) presumption of causation in this case required the factfinder to presume that the claimant's employment as a firefighter was *a contributing cause* of his underlying heart disease, which caused his heart attack. In order to rebut this presumption, the City had to introduce evidence sufficient to support a contrary finding (*i.e.*, a finding that the claimant's employment was

- 13 -

not a contributing cause of his heart disease).[3] See *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 461-63 (1983). The City could do this by presenting expert testimony that (1) exposure to smoke or toxic fumes while fighting fires is not a risk factor for the claimant's heart disease or (2) the claimant's particular level of exposure to smoke or toxic fumes on the job did not causally contribute to his heart disease (*i.e.*, it did not contribute to the development of such disease, aggravate or accelerate the disease, or aggravate or accelerate the claimant's ensuing heart attack).

¶ 56   Here, the City did neither. Instead, it presented Dr. Fintel's opinion that the claimant's heart disease was caused by non-occupational risk factors. In rendering this opinion, Dr. Fintel did not address the claimant's repeated exposure to smoke or toxic fumes during his 31 years of employment as a firefighter. Nor did he explain why such exposure was not, or could not have been, a contributing cause of the claimant's heart condition or ensuing heart attack. In fact, Dr. Fintel testified that he had no knowledge of the particular duties the claimant performed as a firefighter and no information regarding the claimant's exposures to occupational risk factors while he was a firefighter. Thus, Dr. Fintel neither contradicted Dr. Weaver's detailed account of the claimant's occupational exposure to various toxic fumes nor rebutted Dr. Weaver's opinion that the claimant's employment may have been a cause of his cardiovascular disease and heart attack. Instead, Dr. Fintel merely pointed to other contributing causes that he opined were sufficient to cause the claimant's cardiovascular disease and resulting heart attack. In sum, Dr. Fintel presented no facts or reasons supporting his conclusion that the claimant's employment was not a contributing cause of his resulting illness. Nor did Dr. Fintel present any facts or reasons supporting a conclusion that the claimant's employment did not aggravate or accelerate the claimant's cardiovascular disease or ensuing heart attack. Accordingly, Dr. Fintel's opinion lacked foundation (see *Sunny Hill of Will County v. Illinois Workers' Compensation Comm'n*, 2014 IL App (3d) 130028WC, ¶ 36; *Gross v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100615WC, ¶ 24) and could not support a finding of no employment-related causation sufficient to rebut the section 6(f) presumption (see *Franciscan Sisters Health Care Corp*, 95 Ill. 2d at 462-63; *Johnston*, 2017 IL App (2d) 2160010WC, ¶ 70 (Holdridge, P.J., dissenting)).[4]

---

[3]I disagree with the majority's resort to legislative history in determining the quantum of evidence needed to rebut the presumption of causation prescribed by section 6(f). In my view, section 6(f) is unambiguous as to that issue; accordingly, it is unnecessary and inappropriate to consider legislative history in construing the statute. See *Johnston*, 2017 IL App (2d) 160010WC, ¶ 70 & n.4 (Holdridge, P.J., dissenting).

[4]The City also presented the medical opinion of Dr. William Scott, which suffers from the same deficiencies as Dr. Fintel's opinion. Dr. Scott opined that the claimant's coronary artery disease was associated with personal risk factors, and he noted that "other men with similar personal risk factors in different occupations or even in no occupations can experience similar events." However, Dr. Scott did not consider the claimant's significant occupational exposure to smoke or toxic fumes or opine that such exposure could not have been a contributing, aggravating, or accelerating cause of the claimant's coronary artery disease or heart attack. Instead, he merely opined that it would not be medically valid to assume that the claimant's cardiac event "occurred *solely* due to his occupation as a firefighter," while ignoring the claimant's personal risk factors. (Emphasis added.) *Supra* ¶ 25. Accordingly, Dr. Scott's opinion does not rebut the statutory presumption that the claimant's employment with the City was *a* contributing cause of his cardiovascular disease or heart attack.

¶ 57　　　　For the reasons set forth above, I would find that the City failed to rebut the statutory presumption of causation in this case. I would therefore reverse the Commission's decision and remand the matter to the Commission.